2022 IL App (1st) 192484

Nos. 1-19-2484, 1-20-0722, and 1-20-1175 (cons.)

Third Division
June 29, 2022.

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Respondent-Appellee, | ) | |
| | ) | |
| v. | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| JAMES SOTO, | ) | |
| | ) | Nos. 81 CR 7761-01 |
| Petitioner-Appellant. | ) | 81 CR 7761-05 |
| _____ | ) | (cons.) |
| | ) | |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | The Honorable |
| | ) | Timothy J. Joyce, |
| Respondent-Appellee, | ) | Judge Presiding. |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID AYALA, | ) | |
| | ) | |
| Petitioner-Appellant. | ) | |
| | ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     The consolidated appeals of defendants James Soto (Soto) and David Ayala (Ayala) present a host of issues arising from defendants' convictions and sentences for a crime

commonly referred to as the Pietrowski Park shootings. On August 16, 1981, 16-year-old Julie Limas (Limas) and 18-year-old Hector Valeriano (Valeriano), a United States Marine home on leave, were standing with a group of young people in Pietrowski (formerly Keeler) Park, located at 31st Street and Keeler Avenue in Chicago, Illinois. Juan Padilla (Padilla), a member of the Latin Kings street gang, was also in the park. At trial, the State's witnesses described a dark blue van approaching the park and two gunmen firing from a gangway beside the park— one armed with a rifle and one armed with a handgun. Limas and Valeriano were both killed. Padilla was struck by a bullet in the buttocks but survived his injuries.

¶ 2 Soto and Ayala were jointly tried before a single jury and convicted of the murders of Limas and Valeriano, the attempted murder of Padilla, and conspiracy to commit murder. Ayala was convicted on an accountability theory, based on testimony that he ordered the "hits" from a meeting of the Two-Six street gang in the basement of his home. Soto, Ayala's cousin, was convicted for his alleged role as the handgun shooter. There was no physical evidence linking either defendant to the crimes. Indeed, only one trial witness, Wally "Gator" Cruz (Cruz), testified to both Soto and Ayala's involvement in the shooting. Cruz, who admitted to driving the dark blue van that carried the shooters to Pietrowski Park, was originally indicted for the murders with Soto and Ayala, but entered into an agreement with the State whereby he would plead guilty to conspiracy to commit murder and the State would recommend a five-year sentence, to be served at 50% time, in exchange for his testimony against his codefendants. Both Ayala and Soto were sentenced to two life-without-parole sentences, plus thirty years for attempted murder and seven years for conspiracy to commit murder. Defendants timely filed direct appeals of their convictions and sentences, which this court affirmed.

¶ 3        In 2015, pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)), defendants filed the postconviction petitions that are the subject of the instant appeal. In his petition, Ayala alleged, among other things, that he is actually innocent of the murders of Limas and Valeriano, and that his trial counsel labored under a prohibited conflict of interest where defense counsel simultaneously represented an alternate suspect who was later named as a state witness. Like Ayala's initial petition, Soto's 2015 petition, which was a successive petition, alleged that he is actually innocent of the murders of Limas and Valeriano. Soto also adopted Ayala's claim that his trial counsel labored under a prohibited conflict of interest.

¶ 4        Separately, in 2020, Ayala sought leave to file a successive petition pursuant to the Act alleging that, as applied to him, his natural life sentence for a crime committed when he was only 18 years old violates the proportionate penalties clause of our Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 5        Soto and Ayala supported their 2015 petitions with affidavits from numerous individuals attesting to defendants' lack of involvement in the Pietrowski Park shootings. The petitions also alleged significant misconduct on the part of the police, the State, and defendants' own trial counsel. Specifically, Soto and Ayala alleged that after their trial and convictions, they learned that unbeknownst to them, their trial counsel also represented an individual, Victor Rodriguez (V. Rodriguez), where at least three disinterested eyewitnesses told investigators V. Rodriguez was the handgun shooter. V. Rodriguez was indicted for the murders in juvenile court, but the charges were ultimately dismissed, and V. Rodriguez was named as a prosecution witness in the defendants' case. In addition, since the time of trial, several witnesses have either

recanted their testimony, averred that they only failed to testify on defendants' behalf at trial out of fear of retribution from the State, or attested that Cruz's trial testimony was false.

¶ 6 After advancing defendants' 2015 petitions to the second stage of postconviction proceedings, the trial court granted the State's motions to dismiss both petitions. The trial court also denied Ayala leave to file his successive petition alleging a violation of the proportionate penalties clause. For the reasons that follow, we reverse the trial court's order dismissing defendants' 2015 petitions and remand for a third-stage evidentiary hearing on defendants' claims of actual innocence and their trial counsel's conflict of interest. However, we affirm the trial court's order denying Ayala leave to file his successive petition raising a youth-based proportionate penalties clause claim.

¶ 7 BACKGROUND

¶ 8 In September 1982, Soto and Ayala were jointly tried before a single jury and convicted of the murders of Valeriano and Limas, the attempted murder of Padilla, and conspiracy to commit murder. Both Ayala and Soto were sentenced to two life-without-parole sentences, plus thirty years for attempted murder and seven years for conspiracy to commit murder, to be served concurrently. Soto and Ayala were indicted with their codefendants, Cruz and Ruben Palomo (Palomo).[1] Palomo was tried simultaneously by a second jury and found guilty of attempted murder. The jury was hung as to the murder charges against Palomo. Palomo thereafter pled guilty to one charge of murder and received a sentence of thirty years, to run concurrently with a 25-year sentence for the attempted murder.

---

[1]Defendants were also indicted with John "JJ" Rojas, but the record on appeal does not reflect the disposition of his case.

¶ 9    Because Soto and Ayala have raised claims of actual innocence, we describe the evidence presented at trial and contained in the affidavits submitted with their postconviction petitions in detail in this opinion.

¶ 10                                    I. The State's Case at Trial

¶ 11    In sum, the State posited that Soto and Ayala were high ranking members of the Two-Six street gang, and that the Latin Kings were their rivals. According to the State, beginning on the afternoon of August 16, 1981, Ayala hosted a Two-Six meeting in the basement of his home at which "making hits" on Latin Kings was discussed. At some point in the evening, Ayala received a phone call and learned that there were Latin Kings in Pietrowski Park. Ayala then provided weapons to Soto and Palomo, who left Ayala's home with Cruz in Ayala's dark blue van. According to the State, Cruz was the driver of the dark blue van, while Palomo sat in the passenger seat, and Soto sat in the rear. The State alleged that after parking the van in an alley near the park, Palomo and Soto walked into a gangway beside the park and fired into a crowd that had gathered in the park, with Palomo firing the rifle and Soto firing the handgun. After the shooting, Cruz, Palomo, and Soto returned to Ayala's home, where Ayala received another phone call informing him that three people had been shot in the park and two had died.

¶ 12    As noted, the only State witness to testify from personal knowledge that either Soto or Ayala was involved in the crime was their alleged accomplice, Cruz. Cruz testified that on August 16, 1981, he attended a Two-Six gang meeting in the basement of Ayala's home in Westchester, Illinois, at which the Two-Sixes discussed "making hits" on their rival street gang, the Latin Kings. The meeting lasted from around 12:00 or 12:30 p.m. until around 6:00 p.m. that evening. According to Cruz, he attended the basement meeting with Ayala and six other Two-Sixes: Robert "Shy" Jacquez (R. Jacquez), Vince "Demon" Hodge (V. Hodge),

5

Randy "Little Demon" Hodge (R. Hodge), Tom Gutierrez (Gutierrez), Alex "Little Al" Valle (Valle), and Sal Guzman (Guzman). Cruz testified that although both Soto and Palomo were also present in Ayala's home at the time, they were upstairs, and did not attend the basement meeting. According to Cruz, Tyrone Ayala (T. Ayala), Theodore "Sweetwine" Ordonez (T. Ordonez)[2] and Martha Ordonez (M. Ordonez) were also in the house at the time but remained upstairs with Soto and Palomo.

¶ 13      On cross-examination, Cruz admitted that he previously told investigators that several other individuals were at Ayala's house that day. Specifically, Cruz previously told investigators that Javier Jacquez (J. Jacquez), Victor "Fat Victor" Rodriguez (V. Rodriguez), and John "JJ" Rojas (Rojas) attended the basement meeting.[3]

¶ 14      Cruz testified that by 6:00 p.m. all the Two-Sixes had departed Ayala's home except for Cruz, Soto, and Palomo. Around 8:30 or 9:00 p.m., Ayala received a phone call and summoned Soto and Palomo into Ayala's bedroom on the second floor of the house. Cruz heard someone yell out "Kings," and Palomo instructed Cruz to start a van. Cruz went outside, to the driveway, and started Ayala's van that was parked there. He then returned to the house and observed Ayala walk down the stairs, into the basement, and return with a handgun and a rifle, which Ayala began cleaning. After "a while," Soto came into the living room from the second floor of the home. Ayala handed Soto the handgun, which Soto wrapped in a black cloth. Palomo then grabbed the rifle from Ayala, wrapped it in a sweater, and handed it to Cruz, who exited the house and placed the rifle in the backseat of the van. Next, Soto and Palomo exited Ayala's house and entered the van. Cruz sat in the driver's seat, while Palomo sat in the passenger seat,

---

[2] According to M. Ordonez's trial testimony, T. Ordonez was deceased by the time of the jury trial.
[3] Although Cruz denied telling investigators that Robert "Rabbit" Villagomez (Villagomez) was also in the home, a detective was called to testify to Cruz's prior statement that Villagomez was present.

6

and Soto sat in the rear. The trio pulled out of the driveway and headed in the direction of Pietrowski Park.

¶ 15        Cruz drove the van past Pietrowski Park and observed people congregating there. After passing the park, Cruz encountered two teenage girls he knew, Isabel "Chave" Gomez (Gomez) and Lisa Suarez (Suarez), at an abandoned gas station. From the van, Palomo asked the girls "if the Kings were still in the park." Gomez and Suarez replied, "they are." Palomo told them, "Go home, and we'll take care of it." Palomo instructed Cruz to continue to drive the van back toward Pietrowski Park.

¶ 16        While driving back in the direction of Pietrowski Park, near the corner of 31st Street and Keeler Avenue, Cruz encountered Rojas and V. Rodriguez in a "reddish" Matador vehicle, which Cruz recognized as belonging to V. Rodriguez. Palomo had a conversation with V. Rodriguez that Cruz could not hear. After Palomo returned to the van, Cruz continued to drive the van toward the Pietrowski Park, into an alley beside the park. Once in the alley, Palomo, armed with the rifle, and Soto, armed with the handgun, exited the van, and walked behind the van into a gangway while Cruz remained inside the van. Shortly thereafter, Cruz heard both weapons fire. Although Cruz did not testify that he personally observed the shooters fire the shots, he told the jury that when Palomo and Soto ran back into the van they said, "let's go; we might have hit somebody," and they were still holding their weapons. Cruz drove away from the scene and the trio returned to Ayala's home and sat in Ayala's living room. A short while later, Ayala received a phone call, after which Ayala announced, "two people got killed at the park and one got wounded."

7

¶ 17        On cross-examination, Cruz admitted that he previously told investigators that he observed Rojas and V. Rodriguez, whom he had observed driving the reddish Matador vehicle before the shooting, walk into the alley holding guns.

¶ 18        Cruz also informed the jury of the deal he received from the State. Cruz testified that in exchange for his truthful testimony before the grand jury and at trial, the State offered to recommend a five-year sentence for conspiracy to commit murder, which Cruz understood under Illinois law would require that he serve only two and a half years. He also testified that shortly after the Pietrowski Park shootings, he left the state. He returned about a month later and spoke with investigators a month after he returned.

¶ 19        Eyewitness Hugo Flores (Flores) testified that he observed the shooters and provided descriptions of the shooters to the jury. He told the jury that he played softball at the park the afternoon of the shooting and continued to talk and drink beer with his friends at the park into the evening. At approximately 9:25 p.m., Flores left his group of friends to use the bathroom away from the crowd, by some trees further into the park. At around 9:30 p.m. he heard two gunshots, but he could not tell where they were coming from. He then heard four more gunshots. During this second round of shooting, he turned and observed two people standing in a gangway, "aiming at the crowd." He testified that "one had a handgun, and the other one had a rifle." Flores described the rifle shooter as about five feet and seven inches tall, between 160 and 165 pounds, and around 17 or 18 years old. Flores testified that the handgun shooter was approximately five feet and six inches tall and around 16 years old. Flores is Mexican, and both shooters appeared to Flores to be white, not Latino or Mexican. He further testified that he spoke to investigators about three times in the month of August 1981 but was never asked to participate in a photo lineup.

8

¶ 20    Eyewitness John Orozco (Orozco) likewise testified that he was playing softball at Pietrowksi Park all afternoon on the day of the shooting. That evening, there were around thirty or forty people in the park, and Orozco and his friends were hanging out, talking, and drinking beers. Later, several Latin Kings entered the park and gathered there drinking beers as well. At some point, Orozco observed a light blue "animal care" van drive into the park. The van stopped, shined a spotlight on the crowd, and left after five or ten minutes. Orozco did not observe the driver of the van. However, Orozco further testified that immediately after the shooting, he told investigators that he believed Rojas may have been the driver of the animal care van because he knew Rojas worked for that department. About a half hour later, Orozco observed a different, dark blue van enter the park. He testified that he had previously observed Cruz and Rojas drive the dark blue van, which he described as "Two-Six van." A short while later, the shooting began. Orozco testified that he did not observe the shooters.

¶ 21    The State then called eyewitness and victim, Padilla, who told the jury that he was a member of the Latin Kings, and that he was in the park on the night of the shooting with a few friends and fellow Latin Kings. According to Padilla, Pietrowski Park was rival gang territory for the Latin Kings, and the Two-Sixes were the Latin Kings' "main rivals." Padilla testified that he did not observe a dark blue van in the park that evening, but he did observe an "animal care" van shine a spotlight on the crowd before the shooting took place. Padilla testified that he did not observe the shooters.

¶ 22    Finally, Gomez testified that she was in Pietrowski Park on the afternoon of the shooting with her cousins and her friend, Suarez, who was not called to testify. There were around 30 to 40 people in the park, including a man named Mario Abarca (Abarca), who Gomez testified was a member of the Latin Kings. Before the shooting, Gomez left the park with Suarez and

9

walked to a restaurant near the park. Gomez testified that she observed Suarez go to a telephone area in the restaurant, from which, Suarez told her, Suarez made a call to Ayala's home. The defense objected to Gomez's hearsay statement regarding who Suarez called, which the trial court sustained. The trial court instructed the jury to disregard the statement.

¶ 23    Gomez testified that she and Suarez were walking home from the restaurant at around 9:15 p.m. when they encountered Cruz and Palomo in an abandoned gas station parking lot. Cruz was driving a dark blue van and Palomo was in the passenger seat. Gomez could not tell if anyone else was in the van. Palomo asked Gomez who was in the park, and she told him that the Two-Sixes were there, along with "K-Town Party People, Sin City Boys, and this King by the name of Mario [Abarca]." Gomez observed Cruz drive the van in the direction of the park, and Gomez and Suarez continued walking home. As the pair passed Pietrowski Park on their way home, Gomez heard gunshots.

¶ 24    On cross-examination, Gomez testified that she was not interviewed by police until about two to three weeks after the shooting, but that the police returned to interview her every two or three days thereafter. The detectives would "come by [her] house" and "start telling [her] dirty things," and "threaten" her. The officers told her, "We are going to take you by the park. We are going to tell all the people that you did it and you set them up." After a few occasions of such threats, Gomez called the Chicago Police Department's Office of Professional Standards (OPS) to make a complaint. Gomez testified that OPS told her they would "take care of it." Approximately one month later, both she and Suarez were arrested and charged with committing the murders of Limas and Valeriano. Gomez and Suarez were held overnight while the police searched their homes. The murder charges were dropped the following day.

10

¶ 25    During re-cross of Gomez, she revealed that although the State had dismissed the murder charges, the State maintained obstruction of justice charges against her for the year leading up to trial. Defense counsel, having only learned about the obstruction charges against Gomez from Gomez on the stand, requested a recess so that counsel could investigate the circumstances of the pending charges.

¶ 26    The following day, at a sidebar, defense counsel made a record showing that the State had failed to previously disclose any information about the obstruction charges against Gomez. Defense counsel's investigation of the obstruction charges against Gomez also revealed that unbeknownst to defense counsel, other potential witnesses, including V. Hodge, R. Hodge, and Suarez, also had pending obstruction charges against them. The Assistant State's Attorney responded that any lack of disclosure was unintentional and that the charges were a matter of public record. Gomez continued her testimony. She testified that she believed the Assistant State's Attorney who brought the obstruction charges against her was her lawyer, because he had waived all of her court appearances on the obstruction charges, and because the Assistant State's Attorney told Gomez that the charges against her would be dismissed after her testimony at defendants' trial.

¶ 27    In addition to the testimony described above, the State presented evidence from (1) the decedents' relatives, who testified as life-and-death witnesses, (2) evidence technicians, who described bullet fragments recovered from the scene, (3) a firearms examiner, who presented a demonstrative rifle that might have been similar to the one that the rifle shooter used, (4) the medical examiner, who explained the causes of death, (5) a detective, who testified about executing a search warrant at Ayala's home (resulting in the seizure of a bullet cartridge and a rifle manual) and who identified Soto, Ayala, and others as Two-Six gang members, and (6)

11

stipulations that Soto was 20 years old at the time of the offense and that Ayala was 18 years old at the time of the offense.

¶ 28                                    II. The Defense Case at Trial

¶ 29        The defense's presentation at trial focused on impeaching Cruz's credibility and rebutting his testimony that a gang meeting took place in Ayala's basement on the day of the Pietrowski Park shootings. Importantly, however, the defense did not call any witnesses who, according to statements given to investigators shortly after the shooting, identified the handgun shooter as someone other than Soto. Instead, the defense called eight witnesses who provided the testimony further described below.

¶ 30        Valle, who Cruz identified at trial as having attended the basement meeting, testified he was not and could not have been at Ayala's home on the day of the Pietrowksi Park shootings, because he was incarcerated at the juvenile detention center known as the "Audy Home." He remained in the custody of the State of Illinois from August 5, 1981, through his trial testimony on September 24, 1981, and was not released from custody for any reason during that time. A juvenile court clerk confirmed through her trial testimony that Valle was taken into custody on August 6, 1981, and remained incarcerated from that date through trial.

¶ 31        Villagomez, who Cruz identified at trial as having attended the basement meeting, testified that he was at Mother Cabrini Hospital on the day of the Pietrowski Park shootings, recovering from a motorcycle accident. Villagomez testified that was released from the hospital on August 19, 1981. The defense called a clerk of medical records for Mother Cabrini Hospital, who corroborated Villagomez's presence at the hospital. Villagomez further testified that on October 16, 1981, he was arrested and charged with the murders of Limas and Valeriano. He was released three days later, and the charges were ultimately dismissed.

12

¶ 32    J. Jacquez, who Cruz told investigators had attended the basement meeting, testified that he did not know Ayala or Soto personally, and that he was at his own home on the day of the shooting, not at any meeting at Ayala's house. J. Jacquez further testified that in October 1981 he was also arrested and charged with the murders of Limas and Valeriano, but the charges were ultimately dismissed.

¶ 33    T. Ayala, who Cruz told investigators was in Ayala's home at the time of the basement meeting, testified that he was in Woodridge, Illinois at his mother's house on the day of the shootings—not his brother Ayala's house. T. Ayala further testified that on October 15, 1981, he was arrested and charged with the murders of Limas and Valeriano, but the charges were ultimately dismissed.

¶ 34    M. Ordonez, who Cruz told investigators was in Ayala's home at the time of the basement meeting, confirmed that she was indeed at Ayala's home with her children on the day of the Pietrowski Park shootings. She testified that Soto, her brother, was also at the house, but said that Soto did not leave at any point. She further confirmed that T. Ayala was not present in the house that day.

¶ 35    Diana Guana (Guana), who Cruz had not identified as being present in Ayala's home on the day of the shootings, testified that she was Soto's girlfriend. She testified she was with Soto at Ayala's home on the day of the Pietrowski Park shootings, and never observed Soto leave the house. She denied that Cruz was present at Ayala's house that day and denied that any gang meeting took place.

¶ 36    Alisa Orozco testified that, after running into Cruz, whom she knew from grammar school, in the witness quarters of the State's Attorney's Office, she would receive calls from Cruz during the month of March 1982. On a few occasions, Cruz told her he testified falsely before

the grand jury about Soto's and Ayala's involvement in the Pietrowski Park shootings and told her he would lie at trial.

¶ 37    Carol Chapa likewise testified that Cruz frequently called her in March 1982, and that Cruz told her he was going to lie at the grand jury proceedings and at defendants' trial because he was "afraid."

¶ 38    The defense also read into evidence a stipulation that Ayala did not have a dark blue van registered to him in at or around the time of the Pietrowski Park shootings.

¶ 39                                    III. Jury Instructions

¶ 40    Before *voir dire* of Soto and Ayala's jury began, the trial court outlined and explained the fundamental principles of presumption of innocence and reasonable doubt. The trial court further questioned each juror about the State's burden of proof and the jurors' obligation if that burden was not sustained. During closing argument, defense counsel emphasized the presumption of innocence and the State's burden to prove a defendant guilty beyond a reasonable doubt. However, at the jury instructions conference, the Illinois pattern instructions on the presumption of innocence and the burden of proof (Illinois Pattern Jury Instructions, Criminal No. 2.03 (2d ed.1981)) were not tendered by the State, requested by the defense, or required by the court. The pattern instructions were not read to the jury; nor did the jury receive a written instruction on presumption of innocence or burden of proof.

¶ 41    The jury was also not provided the accomplice-witness instruction, Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed.1981), which states that, "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in this case." However, the jury was given Illinois

14

Pattern Jury Instruction, Criminal, No. 3.12 (2d ed.1981), which reads, "Evidence that a witness has been convicted of an offense may be considered by you only as it may affect the believability of the witness." In addition, during closing arguments, defense counsel argued that Cruz had received a "sweet" deal in exchange for his testimony, and further argued that Cruz was a liar, lacked credibility, and had a motive to give false testimony.

¶ 42                                    IV. Criminal Trial Outcome

¶ 43        After eight hours of deliberation, the jury sent out a note saying it was deadlocked on all but one of the charges against Soto and Ayala. The trial court ordered the jury to continue deliberating. After about two more hours, the jury returned verdicts finding both defendants guilty of all counts.

¶ 44        The trial court sentenced both Soto and Ayala to two life-without-parole sentences for the murder, thirty years' incarceration for attempted murder, and seven years for conspiracy, all concurrent.

¶ 45                                    V. Defendants' Direct Appeals

¶ 46        Soto and Ayala filed a consolidated direct appeal of their convictions and sentences, which this court further consolidated with Palomo's separately filed direct appeal. See *People v. Ayala*, 142 Ill. App. 3d 93 (1986). Soto and Ayala argued that the trial judge erred by failing to instruct the jury on presumption of innocence and burden of proof (Illinois Pattern Jury Instructions, Criminal No. 2.03 (2d ed.1981)), by granting a pretrial motion to substitute judge made by the prosecution's primary witness, Cruz, who was still a defendant at the time he made the motion, and by imposing natural life sentences. *Ayala*, 142 Ill. App. 3d at 93. This court affirmed both defendants' convictions and sentences. *Ayala*, 142 Ill. App. 3d at 100.

¶ 47                                    VI. Ayala's Federal Habeas Petition

15

¶ 48    On April 22, 1997, Ayala filed a *pro se* petition for a writ of *habeas corpus* in the United States District Court for the Northern District of Illinois, alleging that the Illinois Appellate Court engaged in an unreasonable application of United States Supreme Court precedent when it affirmed his convictions on direct appeal, even though his jury was not instructed on the principles of proof beyond a reasonable doubt and burden of proof (Illinois Pattern Jury Instructions, Criminal No. 2.03 (2d ed.1981)). The federal district court judge denied Mr. Ayala *habeas* relief but *sua sponte* granted a certificate of appealability to allow Ayala the opportunity to the appeal the decision to the United States Court of Appeals for the Seventh Circuit. See *U.S. ex rel. Ayala v. Washington,* 1997 WL 627648, at *6 (N.D. Ill. Sept. 30, 1997). However, according to Ayala, he was unable to perfect that appeal as he was acting *pro se* and had been transferred to an out-of-state federal facility where he did not receive notice that the certificate of appealability had been granted.

¶ 49                    VII. Soto's Initial Postconviction Petition

¶ 50    On August 29, 1991, Soto filed his first *pro se* postconviction petition pursuant to the Act. In the petition, Soto alleged ineffective assistance of both trial and appellate counsel. First, Soto argued that his counsel was ineffective for failing to call known alibi witnesses. Specifically, he maintained that if called to testify, Gutierrez, R. Jacquez, V. Hodge, R. Hodge, John Martinez (Martinez), and Guzman would have provided testimony discrediting Cruz's trial testimony that a gang meeting occurred at Ayala's home on the day of the Pietrowski Park shootings. However, Soto's August 29, 1991, petition did not provide supporting affidavits from these individuals.

¶ 51    Next, Soto argued that his trial counsel labored under a conflict of interest where "for a time" his attorney, John DeLeon (DeLeon), unbeknownst to him, also represented 16-year-old

16

V. Rodriguez. According to police reports attached as exhibits to Soto's August 29, 1991, petition, several eyewitnesses gave contemporaneous statements to police identifying V. Rodriguez, not Soto, as the handgun shooter. Specifically, according to these police reports, one of the alleged intended targets of the shooting, Abarca, knew V. Rodriguez from school and told the officers that it was V. Rodriguez who had been shooting at him. Additionally, Darrell Mullins (Mullins), who was with Abarca at Pietrowski Park during the shooting, informed the police that he recognized the offender as V. Rodriguez. Eyewitness Laura Salazar also told the police that she observed V. Rodriguez, who she knew previously, first in the shooters' van and again in the alley where the shooters stood. Soto also included evidence that DeLeon represented V. Rodriguez at the police station on the night of V. Rodriguez's arrest on October 5, 1981. Soto argued that DeLeon's representation of V. Rodriguez, an alternate suspect on the same murder charges, caused DeLeon not to call the witnesses that inculpated V. Rodriguez, which in turn rendered DeLeon's counsel constitutionally ineffective.

¶ 52 Soto's initial August 29, 1991, petition further alleged that his trial counsel failed to review certain discovery material, failed to timely object to prejudicial comments and questioning by the State, and failed to request jury instructions regarding the credibility of accomplice testimony (Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed.1981)), and presumption of innocence and burden of proof (Illinois Pattern Jury Instructions, Criminal No. 2.03 (2d ed.1981)). Soto also claimed that he was denied a fair trial where one of the jurors had a prior acquaintance with one of the victims. Lastly, Soto argued that appellate counsel was ineffective for failing to raise certain of these issues in his direct appeal.

¶ 53 The trial court summarily dismissed Soto's August 29, 1991, petition on September 17, 1991. The trial court's written order did not provide bases for the dismissal and instead stated

17

only that the petition was "dismissed." On October 11, 1991, Soto filed a motion for reconsideration and a "supplemental" *pro se* petition alleging that the State knowingly used perjured testimony from Cruz to secure his conviction, and that the evidence at trial failed to prove Soto guilty beyond a reasonable doubt. In support of the supplemental petition, Soto attached affidavits from Padilla, R. Jacquez, and Jose Pizzaro. As relevant to the instant appeal, Padilla, the surviving victim of the shooting, averred that he told the Assistant State's Attorney that he observed the faces of the shooters and could identify them as Cruz and Rojas. Padilla further averred that agent of the State's Attorneys' Office pressured him into testifying at trial that he did not observe the shooters' faces.

¶ 54    The affidavit of R. Jacquez, who Cruz testified had attended the basement gang meeting at Ayala's home, averred that after the Pietrowski Park shootings, R. Jacquez was arrested, told he was being charged with the murders of Limas and Valeriano, and was threatened with the death penalty if he did not admit to being in Ayala's home on the day of the Pietrowski Park shootings. R. Jacquez further averred that he was intimidated into making false statements before the grand jury and wanted to tell the grand jury that he was "never at a meeting on August 16, 1981," but the judge at the grand jury hearing "made him use his Fifth Amendment right" and he did not finish testifying.

¶ 55    On November 8, 1991, the trial court summarily dismissed Soto's motion for reconsideration and his supplemental *pro se* postconviction petition. Soto appealed, raising only the issues of knowing use of perjured testimony and ineffective assistance of appellate counsel for failing to argue that the verdicts of guilty for conspiracy to commit murder and murder were inconsistent verdicts.

18

¶ 56    In an unpublished Rule 23 order entered on February 16, 1993, this court determined that appellate counsel was not ineffective for failing to raise the issue regarding the inconsistent verdicts because the failure to raise the issue did not result in substantial prejudice. *People v. Soto*, No. 1-91-4024, slip op. at 6 (1993) (unpublished order under Supreme Court Rule 23). However, the appellate court vacated the conspiracy conviction in the interests of judicial economy. This court also reversed and remanded the matter for further proceedings under the Act on the ground that the allegations contained in the affidavit submitted by Padilla met the low threshold of presenting the gist of a meritorious constitutional claim at the first stage. The mandate was received by the trial court on April 26, 1993, and the Public Defender's Office was appointed to represent Soto on May 14, 1993.

¶ 57    On April 21, 1993, before the trial court received the appellate court's mandate, Soto filed a second "supplemental" *pro se* petition, raising the same issues he previously raised in his initial August 29, 1991, petition. In support, Soto attached his own affidavit and resubmitted the affidavits attached to his October 11, 1991, supplemental petition. He also submitted a new affidavit from Joseph Rodriguez. On September 21, 1994, the State filed a motion to dismiss Soto's April 21, 1992, supplemental petition, arguing that the allegations in the affidavits were conclusory and insufficient to entitle Soto to an evidentiary hearing. Soto's postconviction counsel did not respond to the State's motion to dismiss.

¶ 58    In January 1996, the Public Defender's Office was permitted to withdraw as Soto's counsel and a private attorney was appointed to represent him. Approximately two years later, on January 29, 1998, the trial court converted Soto's status hearing date into a hearing on the State's still-pending motion to dismiss and granted the motion. Soto's appointed attorney was not present in court when the motion was granted.

19

¶ 59    On February 25, 1998, Soto filed a motion to reconsider the court's January 29, 1998, dismissal order and an "amended" *pro se* petition. On March 13, 1998, Soto filed another *pro se* amendment to his petition. The March 13, 1998, amended petition incorporated Soto's prior arguments and affidavits but also included an affidavit from Gutierrez, who Cruz testified was present at the basement meeting in Ayala's home on the day of the shootings. Gutierrez averred that, contrary to Cruz's testimony, he was not at Ayala's home nor in any basement meeting on August 16, 1981.[4]

¶ 60    In an unpublished order entered on June 14, 2000, this court vacated the trial court's order of January 29, 1998, dismissing Soto's initial petition. *People v. Soto*, No. 1-98-1313 (2000) (unpublished order under Supreme Court Rule 23). The matter had come before the appellate court on the State's confession of error. The State confessed error on the ground that at the time the trial court granted the State's motion to dismiss the petition, Soto's attorney was not present in court and had not yet filed a Supreme Court Rule 651(c) certificate.[5] The matter was again remanded for further proceedings under the Act. However, due to a clerical error, the remand order was not docketed. On October 12, 2001, Soto's petition was reinstated, and new counsel was appointed.

¶ 61    On May 13, 2003, the State filed a second motion to dismiss. The State argued that Soto's March 13, 1998, amended petition failed to raise any claims that were cognizable under the

---

[4] In addition, Soto's March 13, 1998, amended petition attached three affidavits from himself, as well as the previously submitted affidavits from Jacquez, Padilla, and Pizzaro. The petition also purported to attach affidavits from Palomo, Cruz, Joe Cruz, Mark Giamarusti, Rene Calzada, Cheryl Atkins, Greg Escobar, and Rosalindo Soto. However, these purported affidavits are not included in the record on appeal.

[5] Rule 651(c) requires a showing on the record, which may be made by a certificate from the defendant's postconviction counsel, that counsel has (1) consulted with the defendant by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights, (2) "examined the record of the proceedings at the trial," and (3) made any amendments to the defendant's *pro se* petition that are necessary for an adequate presentation of the defendant's contentions. Ill. S. Ct. R. 651(c) (eff. Dec. 1, 1984).

Act, that his claims were conclusory, and that the March 13, 1998, amended petition was untimely and successive.

¶ 62    On July 16, 2008, Soto's newly appointed counsel filed a certificate indicating compliance with Supreme Court Rule 651(c). His counsel made no further amendments to the March 13, 1998, amended petition. On May 13, 2009, the State filed another motion to dismiss the March 13, 1998, amended petition, arguing that the only surviving claim from Soto's original *pro se* petition was the claim that prosecutors intimidated Padilla into not naming the shooters. The State maintained that Padilla's affidavit did not support a substantial showing of a constitutional violation because the claims were nonspecific and conclusory. Soto's counsel did not file a response to the motion to dismiss and informed Soto that his upcoming February 18, 2010, court date was a continuance of a previously scheduled status hearing. Instead, on February 18, 2010, the trial court granted the State's motion to dismiss Soto's March 13, 1998, amended petition.

¶ 63    Soto filed a notice of appeal from that dismissal on March 10, 2010, which was file stamped on March 18, 2010. On March 16, 2010, Soto placed into the prison mail system a *pro se* motion for reconsideration and/or reinstatement of his March 13, 1998, amended petition, which was file stamped on March 23, 2010. On March 25, 2010, Soto placed into the prison mail system a *pro se* supplemental motion for reconsideration, which was file stamped on April 6, 2010. These motions for reconsideration and/or reinstatement included new affidavits in support, which Soto alleged his counsel had failed to attach to his petition before filing the Rule 651(c) certificate without his knowing consent.

¶ 64    On May 14, 2010, the trial court denied Soto's *pro se* motion for reconsideration and/or reinstatement of his March 13, 1998, petition. Soto then appealed from the trial court's

February 18, 2010, second-stage dismissal of his March 13, 1998, amended petition. This court affirmed, finding that the claims asserted were either forfeited or barred by *res judicata*. *People v. Soto*, 2013 IL App (1st) 100863-U, ¶ 47.

¶ 65                           VIII. Defendants' 2015 Petitions

¶ 66      On February 5, 2015, Ayala, through postconviction counsel, filed his first petition for postconviction relief under the Act. Ayala's petition alleged that (1) he is actually innocent of the murders of Limas and Valeriano, (2) he was denied due process where the prosecution concealed exculpatory evidence that it had charged four key witnesses, namely Gomez, Suarez, V. Hodge, and R. Hodge, with obstruction of justice to induce their false testimony and further failed to produce to the defense those witnesses' prior "inconsistent" statements, (3) he was denied effective assistance of counsel where trial counsel failed to reasonably investigate and present testimony from alibi witnesses and failed to screen Ayala's jury for gang prejudice, and (4) cumulative error. Ayala's petition was supported by new affidavits from Abarca, Mullins, Padilla, Palomo, R. Jacquez, Gutierrez, Guzman, V. Hodge, Gomez, R. Villagomez, Martinez, and Guadalupe "Lupe" Mora (Mora).

¶ 67      In these affidavits, Abarca and Mullins attested that—as they told investigators shortly after the shooting—they believed V. Rodriguez, not Soto, was the handgun shooter. Specifically, Abarca averred that in August 1981, he was the chief of the Latin Kings section of the neighborhood. On August 16, 1981, the day of the shootings, Abarca was in the park with Padilla, Mullins, and another individual named Arthur Palicios (Palicios). Abarca heard several shots and followed the shooters to find out who they were because Abarca had been shot at by a Two-Six gang member two weeks earlier. Abarca observed "a tall, white male

22

carrying a rifle and [V. Rodriguez] carrying a handgun." Abarca recognized V. Rodriguez from the neighborhood and yelled at him. V. Rodriguez turned around and fired a shot at Abarca.

¶ 68    Mullins likewise averred that he was in Pietrowski Park on the evening of the shootings with Abarca, Palicios, and Padilla. He was talking to the victim, Limas, when he heard shots ring out from across the street. He fell to the ground until the shooting stopped, then looked to find out where the shots came from. He observed that the shots came from the gangway approximately 15 to 20 feet from where he was standing. He observed V. Rodriguez with a handgun, Palomo, and Cruz carrying a rifle. He and Abarca chased the men through the gangway. By the time Mullins reached the offenders, they jumped into a "truck that looked like a 'dog pound' van." Mullins recognized all of the men because they were Two-Six gang members and he observed them in the area before. Mullins further averred that at the time of the shootings, Mullins told the police what he witnessed, but was told by the police and agents of the State's Attorneys' Office that he "better keep [his] mouth shut" or he would go back to prison.

¶ 69    Padilla, a surviving victim of the shooting and rival gang member, provided a more detailed affidavit than the one he submitted in support of Soto's initial postconviction petition. In his handwritten statement, Padilla averred that on the evening of the shootings, he, Mullins, Abarca and Palicios were driving by Pietrowski Park and decided to stop there. As it started to become dark, he observed Rojas drive by with one other individual. Padilla made eye contact with Rojas, but Rojas kept driving and Padilla "thought nothing of it." Approximately 20 to 40 minutes later, Padilla observed two individuals come out of a gangway and start shooting at them. There was a streetlight by the gangway, and he observed Rojas firing a gun. He tried to run behind his vehicle but was shot in the lower back/buttocks. Abarca chased after the

23

offenders and told Padilla that one offender was V. Rodriguez, who Abarca knew from school. At the hospital, the police asked Padilla if Padilla knew who shot him. Padilla told them "No," because Padilla "wanted to take care of it [himself]," but he did not inform the police of that ambition. Padilla averred that prior to Soto and Ayala's trial, he was living in Texas on parole from a drug conviction but was subpoenaed to testify. When Padilla arrived in Chicago, he spoke to Assistant State's Attorneys about the case. They asked Padilla if he knew who shot him. Padilla told them it was Rojas and V. Rodriguez. The Assistant State's Attorneys told Padilla he "could not say that." They told him to say that the shooters were Palomo and Soto and that Ayala was involved. Padilla told the Assistant State's Attorneys that he wouldn't "get on the stand and lie." The Assistant State's Attorneys tried "a couple of tactics" to try to make Padilla comply, including threatening to violate Padilla's parole, but Padilla refused. Padilla averred that ultimately, he was called to testify that he was a rival gang member and did not identify the shooters.

¶ 70    Palomo, an alleged co-offender, attested that he did not take any orders from Ayala or Soto, but instead "operated on [his] own." He further averred that there was no meeting that took place on the day of the shootings "to go against a rival gang," and that in fact, he did not meet with Ayala or Soto on the day of the Pietrowski Park shootings.

¶ 71    R. Jacquez, Gutierrez, Guzman, and V. Hodge, all of whom, according to Cruz's trial testimony, attended the basement meeting in Ayala's home on the day of the Pietrowski Park shootings, provided affidavits attesting that they were not present at Ayala's home on the day in question, and further attesting to their experiences with the police and the State's Attorney's Office during the investigation. Gomez, Villagomez, Martinez, and Mora, who Cruz did not identify as being present at Ayala's home on the day of the Pietrowski Park shootings also

24

provided affidavits attesting to their whereabouts that day and recalling their treatment by detectives and agents of the State's Attorney's Office during the investigation, as more fully recounted below.

¶ 72    R. Jacquez averred that he was not present at Ayala's home on the day of the shootings and that he did not take part in any gang meeting. He averred that a couple of months after the shooting, when he was only 16 years old, he was arrested and "slapped around and interrogated for three days about a meeting that took place" at Ayala's home on the day of the Pietrowski Park shootings. He was told by detectives that if he signed a paper stating that a meeting took place, he would be allowed to go home; if he didn't sign the paper, "he would go to jail for the rest of his life." He later told the Assistant State's Attorneys prosecuting Soto and Ayala that he had been coerced into implicating Ayala, and that no gang meeting had taken place on the day of the shootings. R. Jacquez averred that when he took the stand at a pretrial hearing, he tried to say, "it was all a lie," but "the Judge made [him] use [his] Fifth Amendment Right," and R. Jacquez did not finish testifying.

¶ 73    Gutierrez averred that he was not present at Ayala's home on the day of the Pietrowski Park shootings, but instead at a game room the entire afternoon. He averred that he was not aware of any meeting taking place on that date. Gutierrez averred he could recall his whereabouts that day because he was subsequently arrested for the murders. The charges were later dismissed.

¶ 74    Guzman provided an affidavit confirming that he did not attend a gang meeting at Ayala's home on the day of the Pietrwoski Park shootings. After the shootings, the police arrested 15-year-old Guzman and detained him for several days where "the police beat [him] with a phone book, slapped [him] in [his] ears, punched [him] in the stomach, etc." He further averred that

he was denied food for three days. Although he asked for an attorney and to see his mother, the police would not provide him an attorney, and he had no family or interested adults present during his interrogation. He eventually "signed the paper, because the police said if [he] signed it, he could go home." After signing the statement, he was brought from the station to testify before the grand jury. Guzman averred that the Assistant State's Attorney told him what he had to say. He did as he was told because he was "confused, shocked, scared, hungry," and he "wanted to go home."

¶ 75        V. Hodge provided an affidavit attesting that he was not at a meeting at Ayala's home on the day of the Pietrwoski Park shootings, and that he did not speak to Ayala or Soto that day. He averred that he was held for three days pertaining to the shootings at Pietrowksi Park, during which, he "was beaten up by the police, threatened by them, and abused and lied to." The police refused to allow V. Hodge to make calls or have an attorney present. The police tried to force him to say that he "was at a meeting on August 16, 1981, at David Ayala's house and that David [Ayala] gave orders for the shootings at Pietrowski Park." When V. Hodge "refused to cooperate" because, "no meeting took place," V. Hodge was charged with obstruction of justice. V. Hodge averred that the charges against him were dropped after Cruz came forward as a witness and testified at trial.

¶ 76        Gomez provided an affidavit in which she recanted her trial testimony regarding her observation that Suarez made a phone call to Ayala on the evening of the Pietrwoski Park shootings. Gomez averred that contrary to her trial testimony, Suarez told her she had placed a phone call to purchase drugs, and Suarez did not tell Gomez who she called. Gomez explained that after she was arrested for murder, she was not given *Miranda* warnings and she was "harass[ed]" and "badger[ed] all night long." Gomez was "deprived of sleep and food," and

26

was not allowed to call an attorney or her parents. The next morning, Gomez was brought in front of the grand jury. Gomez averred that an Assistant State's Attorney threatened her with jail and murder charges if she did not cooperate. Between her grand jury testimony and testimony at trial, she was visited by the police and brought to the office of the Assistant State's Attorney "many times" and "coached intensely and thoroughly from early morning to early evening." They told Gomez "exactly what to say." Gomez further averred that the detectives told her that if she did not cooperate, they would "tell the Latin Kings where [she] lived and drop [her] off in Latin Kings territory so they could rape [her.]" Gomez was "so frightened and confused" that she felt she had "no choice but to cooperate and testify as to what [she] was told."

¶ 77    Villagomez provided an affidavit attesting that he was not at any meeting at Ayala's home on the day of the Pietrowski Park shootings. Indeed, as Villagomez testified at trial, he was hospitalized at this time for a motorcycle injury. He averred that he was charged with murder based off Cruz's statement that he had been at the alleged meeting at Ayala's home. Villagomez averred that upon his arrest, he continued to tell the police and State's Attorneys that it was impossible for him to have been at a meeting at Ayala's home that day because he was in the hospital. When his case was brought in front of a judge, the charges were dismissed.

¶ 78    Martinez provided an affidavit attesting that he was not at any gang meeting at Ayala's home on the day of the Pietrowski Park shootings but was instead at a game room. He averred that he had never been to Ayala's home and only met him on a single occasion. According to Martinez, he was assaulted by police when he refused to adopt a false statement claiming to be at a gang meeting at Ayala's home. Martinez was also eventually charged with the murders and held at a juvenile detention center for several days. After Martinez's case was brought

27

before a judge, the charges were dismissed. Martinez further averred that he would have testified to the foregoing if subpoenaed.

¶ 79 Mora provided an affidavit attesting that she was at Ayala's home on the day of the Pietrowski Park shootings. Mora averred that she was in the home with M. Ordonez, Guana, and M. Ordonez's children. According to Mora, no gang meeting took place and neither Soto nor Ayala left the house.

¶ 80 On April 16, 2015, the trial court advanced Ayala's initial petition to the second stage.

¶ 81 On June 30, 2015, Soto, through postconviction counsel, sought leave to file a successive petition under the Act. Like Ayala's initial petition, Soto's successive petition alleged that (1) he is actually innocent of the murders of Limas and Valeriano, (2) he was denied due process where the prosecution concealed exculpatory evidence that it had charged Gomez, Suarez, V. Hodge, and R. Hodge with obstruction of justice to induce their false testimony and failed to disclose those witnesses' prior inconsistent statements, (3) he was denied effective assistance of counsel where trial counsel failed to reasonably investigate and present testimony from alibi witnesses, and (4) cumulative error. Soto's successive petition adopted the same affidavits and exhibits that supported Ayala's initial petition, as described above. Soto sought leave to file his successive petition based on his claim of actual innocence and argued he satisfied the cause-and-prejudice test as to his other claims.

¶ 82 On October 20, 2015, Ayala filed a supplemental claim to his postconviction petition in which he argued that he was denied effective assistance of trial and appellate counsel where his trial attorney was ineffective for failing to request that the jury receive the accomplice witness instruction, Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed.1981), and that appellate counsel was likewise ineffective for failing to raise the trial error on direct appeal.

28

¶ 83    On December 2, 2015, the trial court granted Soto leave to file his successive petition and advanced it to the second stage, where it proceeded in tandem with Ayala's initial petition before the same trial court.

¶ 84    On February 16, 2016, Ayala brought a motion for postconviction discovery, which the trial court granted. Specifically, Ayala sought and received certain documents from the Chicago Police Department's "street files"[6] regarding its investigation into the Pietrowski Park shootings. Among those materials was a Court Attendance Report dated November 4, 1981, which indicated that V. Rodriguez appeared in juvenile court on November 4, 1981, on a charge of murder in the shooting death of Valeriano. Soto and Ayala's trial counsel, DeLeon, is identified as V. Rodriguez's counsel on the court appearance sheet.

¶ 85    On August 10, 2016, based on the foregoing court appearance sheet, Ayala filed a second supplemental claim to his postconviction petition, alleging that his trial counsel labored under a *per se* and/or actual conflict of interest where trial counsel simultaneously represented V. Rodriguez for the same offense. Ayala maintained that from the date of their arrests on October 16, 1981, all the way through trial, Ayala and Soto were jointly represented by DeLeon and Sam Adam Jr. (Adam), who shared an office and made appearances for each defendant both jointly and individually. Ayala argued that DeLeon's simultaneous representation of V. Rodriguez, who was an alternate suspect, and later named a prosecution witness against Soto and Ayala, created inconsistent loyalties that adversely affected trial counsel's performance at

---

[6] The tern "street file" refers to "a practice the Chicago Police Department once had of maintaining investigative records that were 'withheld from the state's attorney and therefore unavailable as a source of exculpatory information that might induce him not to prosecute or, failing that, would at least be available to defense counsel under *Brady v. Maryland* ***.' " *Fields v. City of Chicago*, 2014 WL 477394, at *6 (N.D. Ill. Feb. 6, 2014). We take judicial notice of the fact that on February 13, 2016, three days before Ayala filed his motion for postconviction discovery, the Chicago Tribune published an article entitled "Old Police 'Street Files" Raise Question: Did Chicago Cops Hide Evidence?" available at https://www.chicagotribune.com/news/ct-chicago-police-street-files-met-20160212-story.html.

trial. Specifically, Ayala pointed to trial counsel's failure to call any of the eyewitnesses who identified V. Rodriguez, not Soto, as the handgun shooter to testify as defense witnesses.

¶ 86    On November 28, 2018, the State moved to dismiss both Ayala's initial petition and Soto's successive petition. On July 24, 2019, the trial court held a hearing on the State's motions to dismiss. At the hearing, the trial court informed the parties that the court had reviewed the parties' briefs as they pertained to Ayala's petition but had not reviewed any of the briefs as they pertained to Soto's successive petition. Soto's counsel provided the court with copies of Soto's submissions. Soto's counsel further explained to the court that she had previously adopted all of Ayala's supplemental claims, and specifically Ayala's trial counsel conflict of interest claim, on behalf of Soto, but failed to document that in a written record. The State did not object to Soto's counsel's representation.

¶ 87    On October 9, 2019, by a single written order, the trial court granted the State's motion to dismiss both Ayala's initial petition and Soto's successive petition, finding defendants' claims procedurally barred as untimely, waived, subject to *res judicata*, or otherwise "without merit." Regarding defendants' claim that trial counsel labored under a *per se* and/or actual conflict of interest, the trial court found there was insufficient evidence to support the claim that Ayala was represented by DeLeon, and instead found that DeLeon represented only Soto. The trial court further found the evidence that DeLeon represented V. Rodriguez at his first court appearance insufficient to support the inference that "at the time of trial here, DeLeon [] operated under any conflict of interest." Finally, regarding actual innocence, the trial court found that the affidavits submitted in support of defendants' petitions were not "newly discovered" and "suffer[ed] from a resounding lack of conclusiveness." After defendants' motions to reconsider were denied, Soto and Ayala separately filed timely notices of appeal.

30

¶ 88                    IX. Ayala's Successive Postconviction Petition

¶ 89        On August 4, 2020, Ayala sought leave to file a successive postconviction petition under the Act, on the ground that his life sentence violated the proportionate penalties clause of the Illinois Constitution, as applied to him, where Ayala received a life-without-parole sentence but was only 18 years old at the time of the offenses. On September 24, 2020, the trial court denied Ayala's motion for leave. Ayala filed a timely notice of appeal from that order, which was then consolidated with his appeal from the trial court's October 9, 2019, order dismissing his initial petition.

¶ 90        On August 21, 2021, this court, on its own motion, further consolidated Ayala's consolidated appeal with Soto's appeal from the trial court's October 9, 2019, order dismissing his successive petition. The trial court's dismissals of these three postconviction petitions are the subject of the instant consolidated appeal.

¶ 91                                   ANALYSIS

¶ 92        Defendants raise several overlapping arguments on appeal. First, both defendants argue that the trial court erred in dismissing their claims that trial counsel labored under a *per se* and/or actual conflict of interest. Second, both defendants argue that the trial court erred by dismissing their claims that trial counsel was ineffective for failing to call witnesses who identified V. Rodriguez as the shooter and alibi witnesses who would have rebutted Cruz's account of gang meeting occurring in Ayala's basement on the day of the shootings. Third, both defendants argue that the trial court erred by dismissing their *Brady* claims. Finally, both defendants argue that the trial court erred by dismissing their claims of actual innocence.

¶ 93        In addition to these shared bases of appeal, Ayala also appeals the trial court's dismissal of his claim that trial counsel was ineffective for failing to instruct the jury on the weight to be

31

afforded accomplice-witness testimony and request that the jury be *voir dired* about gang bias, and his claim that appellate counsel was likewise ineffective for failing to raise these issues on direct appeal. Ayala also appeals the trial court's September 24, 2020, order denying his motion for leave to file a successive postconviction petition.

¶ 94                              I. The Postconviction Hearing Act

¶ 95     The Act provides a statutory remedy for criminal defendants who claim that their constitutional rights were violated at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act provides for three stages of review by the trial court. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the first stage, for an initial petition, the trial court may summarily dismiss a petition only if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2014); *Domagala,* 2013 IL 113688, ¶ 32. "[T]he Act does not permit any further pleadings from the defendant or any motions or responsive pleadings from the State. Instead, the circuit court considers the petition independently, without any input from either side." *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). Moreover, "the Act does not authorize the dismissal of a postconviction petition during the initial stage based on untimeliness." *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). As noted, here, the trial court found that Ayala's initial petition passed muster under this initial review, and advanced Ayala's initial petition to the second stage.

¶ 96     Although our supreme court has made clear that the Act contemplates only one postconviction proceeding, "[n]evertheless, [our supreme] court has, in its case law, provided two bases upon which the bar against successive proceedings will be relaxed" *Edwards,* 2012 IL 111711, ¶ 22. Those two bases are (1) cause and prejudice for failing to raise the claim in an earlier proceeding and (2) actual innocence. *Edwards*, 2012 IL 111711, ¶ 22-23. Prior to commencing a successive proceeding, a defendant must obtain leave of court to file his or her

32

petition. *People v. Robinson*, 2020 IL 123849, ¶ 43. If leave to file is granted, the petition is docketed for second-stage proceedings. *People v. Sanders*, 2016 IL 118123, ¶ 28. In the case at bar, Soto's motion for leave to file a successive petition alleged both cause and prejudice and actual innocence. As noted, the trial court advanced Soto's successive petition to the second stage, where it proceeded in tandem with Ayala's initial petition raising similar claims and supported by the same evidence.

¶ 97     At the second stage, the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-5 (West 2014); *Domagala*, 2013 IL 113688, ¶ 33. "Where the State seeks dismissal of a postconviction petition instead of filing an answer, its motion to dismiss assumes the truth of the allegations to which it is directed and questions only their legal sufficiency." *People v. Miller*, 203 Ill. 2d 433, 437 (2002). The trial court must then determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). If the defendant makes a substantial showing at the second stage, the petition must be advanced to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34; *People v. Allen*, 2015 IL 113135, ¶ 22. At a third-stage evidentiary hearing, the trial court acts as factfinder, determines witness credibility and the weight to be given particular testimony and evidence, and resolves any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 98     As noted, defendants' 2015 petitions were dismissed at the second stage. A second-stage dismissal of a defendant's petition presents a legal question we review *de novo*. *People v. Whitfield*, 217 Ill. 2d 177 (2005); *People v. Dupree*, 2018 IL 122307, ¶ 29 (review of a second-stage dismissal is *de novo*). *De novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *People v. Van Dyke*, 2020 IL App (1st)

33

191384, ¶ 41. Since this stage involves purely a legal determination, "[t]he inquiry [at the second stage] does not require the trial court to engage in any fact-finding or credibility determinations." *Dupree*, 2018 IL 122307, ¶ 29. "Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation." *Domagala*, 2013 IL 113688, ¶ 35.

¶ 99                                    II. Timeliness of Ayala's Petition

¶ 100      As an initial matter, the State argues on appeal, as it did in its motion to dismiss Ayala's petition, that all of Ayala's claims, aside from his trial counsel conflict of interest claim and his actual innocence claim, are time barred under the Act. We agree. Ayala was sentenced on October 25, 1982. Consistent with the Act in effect at that time, Ayala had 20 years from that date on which to file his postconviction petition. In 1984, the Act was amended to shorten the limitations period to 10 years. Pub. Act 83-1362, art. II, § 44 (eff. Sept. 11, 1984) (amending 725 ILCS 5/122-1(c)). In 1992, the Act was again amended to further shorten the limitations period to three years. Pub. Act 87-580, § 1 (eff. Jan. 1, 1992) (amending 725 ILCS 5/122-1(c)). Our supreme court has held that amendments to the Act's limitations period apply retroactively. See *People v. Bates*, 124 Ill. 2d 81, 86 (1988). It is therefore irrelevant whether the limitations period expired in 1987 as urged by the State, or 1992 as proposed by Ayala. Either way, Ayala's 2015 petition cannot be considered timely unless Ayala has demonstrated that his failure to bring his claim was not due to his "culpable negligence." 725 ILCS 5/122–1(c) (West 2014).

¶ 101      Ayala maintains that his failure to bring his claims during the limitations period prescribed by the Act was due to his incarceration in a supermax facility from 1998 through 2012, where, according to Ayala, he was held in solitary confinement for 23 hours a day. Nevertheless, we

34

agree with the State and trial court that this draconian incarceration does not excuse Ayala's failure to raise the trial errors or violations of his constitutional rights of which he should have been aware before that time, and Ayala offers none. See *People v. Johnson*, 2017 IL 120310, ¶ 10 (defendant's claim of delay, which occurred in 2008, could not provide a basis for excusing the late filing of postconviction petition because they occurred after the deadline had passed). In addition, we agree with the trial court's assessment that Ayala's ability to litigate his 1997 federal *habeas* petition demonstrates a "concomitant ability to litigate in Cook County Circuit Court under the Act" at that time. Accordingly, we find no error in the trial court's dismissal of Ayala's trial and appellate ineffective assistance of counsel claims as they pertain to counsel's failure to call alibi witnesses, failure to instruct the jury on the weight to be afforded accomplice-witness testimony, failure to request that the jury be *voir dired* about gang bias, and failure to raise these issues on direct appeal, nor in the trial court's dismissal of Ayala's *Brady* claim. We reach the merits of Ayala's of actual innocence claim and trial counsel conflict of interest claim further below.

¶ 102　　　　　　　　　　III. Procedural Bars to Soto's Successive Petition

¶ 103　　　The State argues that Soto's trial counsel conflict of interest claim and *Brady* claim were properly dismissed because, as to these claims, Soto failed to allege cause and prejudice as required to sustain a successive petition under the Act.

¶ 104　　　We are not persuaded by the State's argument. The State had the opportunity to seek dismissal of Soto's petition at second-stage proceedings on cause-and-prejudice grounds for these claims but did not. *People v. Bailey*, 2017 IL 121450, ¶ 26. In addition, while advancing Soto's successive petition to the second stage, the trial court expressed its view that Soto's and

35

Ayala's petitions should proceed "on par."[7] The State agreed that was the "perfect" approach. Under these circumstances, "it would be manifestly unfair" to allow the State to benefit from an error the State itself "injected into the proceedings" by consenting to the trial court's actions. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). This is especially so in the case at bar because Ayala's claims arise from the same set of facts as Soto's petition and any resolution of Ayala's claims will therefore bear directly upon the rights of Soto. We thus agree with the trial court that defendants' claims should proceed "on par."

¶ 105    Moreover, "even in the absence of an articulated request" a trial court may "*sua sponte* grant leave to file [a] successive petition," and "there is no impediment to appellate review of the trial court's ruling in such a case." *Sanders*, 2016 IL 118123, ¶ 27 (citing *People v. Tidwell*, 236 Ill. 2d 150, 158 (2010)); see also *People v. Harper*, 2013 IL App (1st) 102181, ¶ 37 ("[T]he defendant's petition advanced to the second stage of the postconviction proceedings by virtue of the circuit court's granting of the motion for leave to file and appointing counsel. Accordingly, the defendant properly obtained leave to file the instant successive postconviction petition"). We are therefore unpersuaded that Soto's failure to specifically articulate cause and prejudice for his trial counsel conflict of interest claim precludes our review on the merits in the unique circumstances presented here, where the trial court considered these claims at the second stage. Instead, "Based on the second-stage procedural posture of the instant case, the relevant question is whether the allegations of the petition, supported by the trial record and the accompanying affidavits, demonstrate a substantial constitutional deprivation which requires an evidentiary hearing." *People v. Makiel*, 358 Ill. App. 3d 102, 106 (2005).

---

[7] "On par" is defined as "equal in importance or quality to; on an equal level with." Lexico, https://www.lexico.com/en/definition/par (last visited June 1, 2022).

¶ 106    The State further argues that Soto's trial counsel conflict of interest and *Brady* claims are barred by the doctrines of *res judicata* and forfeiture. In a postconviction proceeding, the common law doctrines of *res judicata* and forfeiture operate to bar the raising of claims that were or could have been adjudicated in a prior proceeding. *People v. Blair*, 215 Ill. 2d 427, 443 (2005). The doctrine of *res judicata* bars the consideration of issues that were previously raised and decided in a prior proceeding. *Blair*, 215 Ill. 2d at 443. The doctrine of forfeiture bars claims that could have been raised in a prior proceeding but were not. *Blair*, 215 Ill. 2d at 443-44. Exceptions to these doctrines may allow otherwise-barred claims to proceed where fundamental fairness so requires, where the alleged forfeiture stems from the incompetence of appellate counsel, or where the facts relating to the claim do not appear on the face of the original appellate record. *Blair*, 215 Ill. 2d at 450-51.

¶ 107    The State argues that Soto's trial counsel conflict of interest claim is barred by *res judicata* because Soto included a similar trial counsel conflict of interest claim in his initial August 29, 1991, petition, which was summarily dismissed, and forfeited because he did not reraise the issue on appeal from that dismissal. Although a summary dismissal of a postconviction petition may be treated as an adjudication on the merits for the purposes of *res judicata*, where, as here, a subsequent claim is supported by substantial new evidence, fundamental fairness dictates that the doctrine of *res judicata* may be relaxed. See *People v. Holman*, 191 Ill. 2d 204, 210 (2000); *People v. Patterson*, 192 Ill. 2d 93, 139 (2000) ("We have recognized [] that, in the interests of fundamental fairness, the doctrine of res judicata can be relaxed if the defendant presents substantial new evidence."). Without evidence concerning the extent and duration of DeLeon's representation of V. Rodriguez, Soto could not, and did not, raise the specific conflict of interest claim presently before the court. See *People v. Harris*, 206 Ill. 2d 1, 15

37

(2002) (*res judicata* did not bar postconviction claim where the facts supporting the claim did not appear in original appellate record). Nor has Soto forfeit his ability to bring this claim. As noted, it was not until 2016 that the extent and duration of DeLeon's representation of V. Rodriguez became known to Soto. Pursuant to our supreme court's decision in *Harris*, because the facts relating to this claim did not appear on the face of the original appellate record or the initial postconviction record, the doctrine of forfeiture does not apply. *Harris*, 206 Ill. 2d at 15.

¶ 108    However, we find that Soto's *Brady* claim is procedurally barred. The record reflects that Soto was aware of certain facts supporting his *Brady* claim, specifically the obstruction of justice charges against V. Hodge, R. Hodge, Gomez, and Suarez, at the time of trial. Moreover, Soto was aware of the alleged police and prosecutorial misconduct supporting the *Brady* claim he raises on appeal as early as October 11, 1991, when he submitted affidavits from Padilla and R. Jacquez attesting to their mistreatment by the State. While the additional affidavits detailing police and prosecutorial misconduct submitted with Soto's successive petition add weight to his *Brady* claim, they do not alter the substance of the *Brady* claim that could have been raised earlier. Accordingly, because Soto could have raised his *Brady* claim in his initial petition, but did not, he has forfeited the claim. *Blair*, 215 Ill. 2d at 443-44.

¶ 109    Having thus narrowed the issues presently before the court, we turn to the merits of defendants' remaining claims: trial counsel conflict of interest and actual innocence.

¶ 110                              IV. Trial Counsel Conflict of Interest

38

¶ 111     Both the United States Constitution and the Illinois Constitution guarantee criminal defendants the right to the effective assistance of counsel. *Hale*, 2013 IL 113140, ¶ 15 (citing U.S. Const., amends. VI, XIV, and Ill. Const. 1970, art. I, § 8).

¶ 112     The Illinois Supreme Court has found that, to determine whether a defendant was denied his or her right to effective assistance of counsel, a reviewing court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Colon*, 225 Ill. 2d 125, 135, (2007) (*citing People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). Under *Strickland*, a defendant must prove both (1) that his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness (*i.e.* counsel's performance was deficient) and (2) that absent these errors, there was a reasonable probability that his trial would have resulted in a different outcome (*i.e.* counsel's deficient performance was prejudicial). *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687, 694).

¶ 113     The establish deficient performance, a defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36. Under this prong, a defendant has the burden to "overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Anderson*, 2013 IL App (2d) 111183, ¶ 54.

¶ 114     Under the second prong of the *Strickland* test, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient

performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135.

¶ 115      "A criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation." *People v. Taylor*, 237 Ill. 2d 356, 374 (2010). Counsel is deemed constitutionally ineffective where his allegiance is "diluted by conflicting interests or inconsistent obligations." *People v. Spreitzer*, 123 Ill. 2d 1, 14-15 (1988). Our supreme court has recognized two types of conflict: *per se* and actual. *Green*, 2020 IL 125005, ¶ 20. A *per se* conflict arises when the attorney had or has "a tie to a person or entity" that would benefit from a verdict unfavorable to the client. *Spreitzer*, 123 Ill. 2d at 16.

¶ 116      Pursuant to long-standing precedent, there are only three situations in which this occurs: "(1) when defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution [citations]; (2) when defense counsel contemporaneously represents a prosecution witness [citations]; and (3) when defense counsel was a former prosecutor who had been personally involved in the prosecution of the defendant [citation]." *Hernandez*, 231 Ill. 2d 134, 143-44 (2008); accord *Fields*, 2012 IL 112438, ¶ 18; *Green*, 2020 IL 125005, ¶ 43; *In re Br. M.*, 2021 IL 125969, ¶ 45.

¶ 117      In this "closed set" of situations, the tie "may have subtle or subliminal effects on counsel's performance that are difficult to detect and demonstrate." *In re Br. M.*, 2021 IL 125969, ¶ 55; *Peterson*, 2017 IL 120331, ¶ 103. Accordingly, a defendant alleging a *per se* conflict need only show that one of these ties exists (see *People v. Hillenbrand*, 121 Ill. 2d 537, 544 (1988)) and need not show that it affected the attorney's performance. Under *Strickland*, prejudice is presumed. *Green*, 2020 IL 125005, ¶ 21 ("'allegations and proof of prejudice are unnecessary in cases where a defense counsel *** might be restrained in fully representing the defendant's

interests due to *** commitments to others' " (quoting *People v. Coslet*, 67 Ill. 2d 127, 133 (1977)); *Hernandez*, 231 Ill. 2d at 142-43. When a *per se* conflict is established, the remedy is automatic reversal unless the client waived the conflict. *Green*, 2020 IL 125005, ¶ 24; *In re Br. M.*, 2021 IL 125969, ¶ 46.

¶ 118        In the case at bar, defendants argue first that their trial counsel labored under the first *per se* conflict of interest category because DeLeon had "a prior or contemporaneous association with" V. Rodriguez, who defendants maintain was "an entity assisting the prosecution." We are not persuaded by defendants' argument regarding the applicability of the first *per se* conflict category. In *Fields*, 2012 IL 112438, our supreme court rejected the notion that a *person*, such as V. Rodriguez, could be considered an "entity" for the purposes of the application of the *per se* conflict rule. *Fields*, 2012 IL 112438, ¶¶ 29-30 ("[O]ur case law has always recognized a difference between a person and an entity in the context of *per se* conflicts of interest."). The court further explained that to interpret the term "entity *** assisting the prosecution" to encompass a potential state witness like V. Rodriguez, "would render superfluous the second situation where a *per se* conflict exists." *Fields*, 2012 IL 112438, ¶ 29.

¶ 119        Defendants' reliance on our supreme court's decision in *Hernandez*, 231 Ill. 2d 134 (2008), is therefore unavailing. In *Hernandez*, the court found that DeLeon's prior representation of a *victim* created a *per se* conflict of interest where DeLeon later represented a defendant accused of soliciting a murder for hire against the victim, even though DeLeon had no active relationship with the victim at the time of defendant's trial. *Hernandez*, 231 Ill. 2d at 151. The *Hernandez* court found a *per se* conflict because DeLeon had a "prior or contemporaneous association with a *** victim." *Hernandez*, 231 Ill. 2d at 151. In other words, the circumstances of DeLeon's representation in that case fell squarely within the first *per se* conflict situation.

41

But here, because V. Rodriguez cannot be considered "a victim, the prosecution, or an entity assisting the prosecution," the first *per se* conflict situation does not apply.

¶ 120    Whether the second *per se* conflict situation applies in the case at bar presents a closer question. Defendants argue that DeLeon "contemporaneously" represented V. Rodriguez and defendants because DeLeon represented V. Rodriguez from the night of his arrest on October 5, 1981, through at least his first juvenile court appearance on November 4, 1981, and represented Soto and Ayala from the night of their arrests on October 16, 1981, all the way through defendants' jury trial. We agree that these facts show a "contemporaneous" representation of at least 19 days. See *People v. Murphy*, 2013 IL App (4th) 111128, ¶ 50 ("[T]here is no question as to what the word 'contemporaneous' means; it means 'existing, occurring, or originating at the same time.' [Citation]."); *People v. Daly*, 341 Ill. App. 3d 372, 377 (2003) ("In a situation where defense counsel has previously represented one of the State's witnesses, a *per se* conflict of interest exists if the *professional relationship* between counsel and the witness is *contemporaneous* with counsel's representation of defendant."). The record also establishes that V. Rodriguez was, for an unknown length of time, named as a state witness in the case against Soto and Ayala. The State responds that because V. Rodriguez never testified at defendants' trial, he never assumed the status of a "prosecution witness" in a capacity that could support a finding of a *per se* conflict of interest. Thus, "the question becomes whether [V. Rodriguez's] relationship to the case triggers the *per se* rule." *People v. Morales*, 209 Ill. 2d 340, 346 (2004).

¶ 121    In support of its position that the second *per se* conflict category does not apply, the State cites our supreme court's decision in *Morales*, 209 Ill. 2d at 346. There, the court found that no *per se* conflict of interest arose where a potential witness's out-of-court statements about

42

the defendant were admitted into evidence at sentencing, where the potential witness never testified at the defendant's trial or otherwise. *Morales*, 209 Ill. 2d at 346. The court reasoned that because the potential witness "was never a witness," defense counsel did "not assume the status of attorney for a prosecution witness." *Morales*, 209 Ill. 2d at 346. Defendants respond that *Morales* is distinguishable from the case at bar. Most importantly, in *Morales*, defense counsel represented the potential state witness on charges unrelated to the charges against the defendant. The *Morales* court was therefore unpersuaded that the potential state witness stood to benefit from the defendant's conviction. *Morales*, 209 Ill. 2d at 347 ("Speculation that [potential state witness] might have stood to benefit from a verdict against defendant does not support application of the *per se* rule."). In addition, although the *Morales* decision did not turn on the issue of waiver, the defendant there was in fact informed of his counsel's potential conflict and waived it in open court. *Morales*, 209 Ill. 2d at 344. By contrast, here, the named state witness, V. Rodriguez, was an alternate suspect on the very same murder charges as Soto, and there is therefore no need to speculate as to whether he stood to benefit from Soto's conviction. Moreover, defendants allege that they were never made aware of DeLeon's representation of V. Rodriguez, and therefore could not have waived the conflict. This court has identified at least two decisions in which our appellate courts have found the existence of a *per se* conflict in analogous situations.

¶ 122     In *People v. Woidtke*, 313 Ill. App. 3d 399 (2000), the defendant, Woidtke, was charged with murder. For six months, his appointed counsel also simultaneously represented another man, Anderson, on several misdemeanor charges of impersonating an officer and obstructing justice, which arose when Anderson was accused of presenting himself to several individuals as an investigator in the murder for which Woidtke was charged. *Woidtke*, 313 Ill. App. 3d at

43

409. In finding a *per se* conflict, the *Woidtke* court found significant the facts that counsel represented both Woitdke and Anderson on charges stemming from the same murder, that Anderson was at various times considered a suspect in the murder, and that counsel considered Anderson a potential witness, even though Anderson did not testify. *Woidtke*, 313 Ill. App. 3d at 410. Based on the foregoing, the court reasoned that counsel "would be obligated by the nature of his representation of Anderson to protect as privileged any information he obtained in Anderson's involvement in the [] murder," which rendered his assistance to Woidtke *per se* ineffective. *Woidtke*, 313 Ill. App. 3d at 411.

¶ 123    More recently, in an unpublished Rule 23 order, the court in *People v. Matthews,* 2021 IL App (1st) 192180-U, ¶¶ 29-36, determined that the defendant had adequately alleged the existence of a *per se* conflict by pleading that his counsel represented a named state witness during the same time period he represented the defendant at his murder trial, where the named State witness was the mother of an alternate suspect, and therefore had a stake in the defendant's conviction. In so finding, the court explained that "a *possible* conflict is enough for the purposes of the *per se* rule," and cited *Morales* for the proposition that, "when determining whether a possible *per se* conflict arose from defense counsel's representation of a named witness, the question is *whether the named witness stood to benefit from defendant's conviction.*" *Matthews*, 2021 IL App (1st) 192180-U, ¶ 32 (citing *Morales*, 209 Ill. 2d at 347) (emphasis in original).

¶ 124    In the case at bar, we find defendants' allegations that DeLeon's client, V. Rodriguez, was both a named state witness and also an alternate suspect for the same offense are sufficient to trigger the *per se* conflict rule if substantiated at a third-stage evidentiary hearing. We are not persuaded by the State's argument that no *per se* conflict can ever arise where a named

44

prosecution witness does not testify at trial. See *People v. Thomas*, 131 Ill. 2d 104, 113-14 (1989) (finding a *per se* conflict where defense counsel represented a disclosed prosecution witness but failed to call that witness at the defendant's pretrial suppression hearing to challenge the veracity of the witness's statements to police); *Murphy*, 2013 IL App (4th) 111128, ¶ 74 ("We are aware of no case in which the supreme court has said, plainly and outright, that the only contemporaneous representation that counts, for purposes of the *per se* conflict rule, is contemporaneous representation during trial."); *People v. Lomax*, 2022 IL App (5th) 190407-U, ¶ 17 (remanding to trial court for determination of whether defense counsel labored under *per se* conflict at time of defendant's plea hearing). Instead, the extent to which V. Rodriguez was a "prosecution witness" at any critical point during DeLeon's contemporaneous representation of defendants is a factual question to be answered at a third-stage evidentiary hearing.

¶ 125    Moreover, here, by virtue of the fact that V. Rodriguez was charged in juvenile court, where many records are sealed, defendants lack information regarding the extent and duration of DeLeon's representation of him. As our supreme court explained in Morales, "A *per se* conflict is one in which 'facts about a defense attorney's status *** engender, *by themselves*, a disabling conflict.' " *Morales*, 209 Ill. 2d at 346 (citing *Spreitzer*, 123 Ill. 2d at 14 (emphasis in original)). Having made a substantial showing that DeLeon contemporaneously represented V. Rodriguez, defendants are entitled to discover, at a third-stage evidentiary hearing, whether further facts support their claim that DeLeon operated under a *per se* conflict of interest.

¶ 126    In addition, even if the evidence does not ultimately show the existence of a *per se* conflict, defendants are "not left without recourse in this case." *Fields*, 2012 IL 112438, ¶ 38. Where a *per se* conflict does not exist, a defendant may still establish a violation of his right to effective

45

assistance of counsel by showing an actual conflict of interest that adversely affected his counsel's performance. *Morales*, 209 Ill. 2d at 348–49. To show an actual conflict of interest, a defendant must point to " 'some specific defect in his counsel's strategy, tactics, or decision making attributable to [a] conflict,' "*Morales*, 209 Ill. 2d at 349, but "need not show the conflict contributed to his conviction." *People v. Moore,* 189 Ill. 2d 521, 539 (2000). Here, we find Soto and Ayala have made a substantial showing that DeLeon's alleged dual loyalties may have "affected the adequacy of his representation." *Spreitzer*, 123 Ill. 2d at 19.

¶ 127 Specifically, DeLeon failed to call as witnesses three individuals who, shortly after the shooting, identified his client V. Rodriguez, not Soto, as the handgun shooter. The decision not to call these witnesses may certainly constitute a "specific defect" in counsel's trial strategy, where the State claimed there was only one handgun shooter, and no person other than Cruz—at trial or otherwise—ever identified Soto as that handgun shooter or even claimed that Soto was in or near Pietrowski Park on the day of the shootings. See *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 48 (failure of trial counsel to call a witness who would contradict the State's evidence and support the defense reflects deficient performance); *People v. Johnson*, 2019 IL App (1st) 153204, at ¶ 44 (counsel's strategy may be deemed ineffective when it results in counsel's failure to present exculpatory evidence of which he is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense).

¶ 128 The State conjectures that DeLeon made a strategic decision not to call these witnesses because he deemed them not to be credible, or because elements of their statements to police corroborated parts of Cruz's narrative, or because their statements to police did not fully exculpate Soto, but such speculative justifications do not defeat the more probable inference: that DeLeon could not call these witnesses without betraying his duty of loyalty to V.

Rodriguez or disclosing information that V. Rodriguez shared with DeLeon under the cloak of attorney-client privilege. More importantly however, to the extent the State wishes to probe DeLeon's motivations or trial strategy, the appropriate venue to do so is at a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34; *People v. Gacho*, 2012 IL App (1st) 091675, ¶ 32 (remanding for a third-stage evidentiary hearing but declining to resolve question of "whether counsel labored under a *per se* conflict of interest or what effect an actual conflict might have had on the defendant's trial" because "the evidence adduced at any such hearing may affect the strength of defendant's allegations in unforeseeable ways"); see also *People v. Boswell*, 2020 IL App (4th) 180165, ¶ 28 (defendant was entitled to a third-stage evidentiary hearing on his conflict of interest claim where defendant made a substantial showing that trial counsel labored under *per se* or actual conflict of interest).

¶ 129     Lastly, we note that although the trial court found Ayala had not supported his claim that DeLeon represented him at trial or that DeLeon's conflicts could be imputed to Ayala's named trial counsel, Adam, the State concedes these points on appeal. Indeed, the trial court's finding was error. The record reflects that at pretrial proceedings and during defendants' jury trial, DeLeon and Adam represented to the trial court that they "jointly represented" Soto and Ayala. In addition, Ayala's postconviction affidavit attests that he understood DeLeon to be one of his attorneys. Finally, Ayala has alleged that DeLeon and Adam both worked for the same small firm, and that DeLeon operated as Adam's associate. It is well-settled that "if one member of a private law firm has a *per se* conflict of interest, that conflict is imputed to all other members of the law firm, regardless of whether any of those other members had any personal involvement in the conflicting representation." *People v. Fountain*, 2012 IL App (3d) 090558, ¶ 16 (collecting cases); see also Ill. Rs. Prof'l Conduct (2010) R. 1.7; R. 1.10(a); R.

47

1.8(k). Although DeLeon and Adam may not have formally been partners in a law firm, defendants' petitions attached pages from a 1981 edition of Sullivan's Law Directory, which show that, at minimum, DeLeon and Adam worked out of the same suite within the same office building at that time. See *People v. Buckhanan*, 2017 IL App (1st) 131097, ¶ 29 (attorneys who act as co-counsel in criminal matters, share office space, and cover for various court appearances arguably constitute a law firm under Ill. R. Prof'l Conduct (2010) R. 1.0). Again here, to the extent the postconviction record leaves room for doubt regarding these questions of fact, those doubts must be resolved at a third-stage evidentiary hearing; they do not defeat Ayala's claim as a matter of law. See *Domagala*, 2013 IL 113688, ¶¶ 34-35 (evidentiary conflicts are to be resolved at third stage evidentiary hearing).

¶ 130      Accordingly, we find that both Soto and Ayala are entitled to a third-stage evidentiary hearing on their claim that trial counsel labored under a *per se* or actual conflict of interest.

¶ 131                                    V. Actual Innocence

¶ 132      The due process clause of the Illinois Constitution affords postconviction petitioners the right to assert a claim of actual innocence based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). In addition, a freestanding claim of actual innocence is cognizable under the Act. *People v. Coleman*, 2013 IL 113307, ¶ 96. For an actual innocence claim to survive second-stage dismissal, the evidence in support of the claim must be newly discovered, material and not merely cumulative, and of a conclusive character. *Ortiz*, 235 Ill. 2d at 333; *People v. Morgan*, 212 Ill. 2d 148, 154. Newly discovered means that the evidence was not available at trial and could not have been discovered earlier through the exercise of due diligence. *People v. Burrows*, 172 Ill. 2d 169, 180, (1996). Material means that the evidence is relevant and probative of the defendant's innocence. *Coleman*, 2013 IL 113307, ¶ 96.

48

Noncumulative means that the evidence adds to what the jury heard. *Coleman*, 2013 IL 113307, ¶ 96. Finally, evidence is of a conclusive character where, when considered along with the trial evidence, it would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. As we explain below, defendants' petitions and supporting documents, properly construed, make a substantial showing as to all three of the actual-innocence prongs such that the petitions should have been advanced to the third stage.

¶ 133                                          A. Newness

¶ 134        "Newly discovered" means that the evidence was not available at trial and could not have been discovered earlier through the exercise of due diligence. *Burrows*, 172 Ill. 2d 169, 180. The "due diligence" requirement for newly discovered evidence applies to the diligence shown before trial. *People v. Smith*, 2015 IL App (1st) 140494, ¶ 19.

¶ 135        First, defendants argue that the affidavits of four alleged gang meeting participants, R. Jacquez, Gutierrez, Guzman, and V. Hodge, none of whom testified at trial, qualify as newly discovered evidence. The State responds, and defendants concede, that these individuals were all known to defendants prior to trial. However, defendants maintain that State misconduct rendered these witnesses unavailable. Specifically, defendants argue that R. Jacquez sought to recant his grand jury testimony implicating Ayala prior to trial but was instructed by the court to assert his fifth amendment right against self-incrimination. Defendants further argue that Gutierrez, Guzman, and V. Hodge were rendered unavailable because the police and agents of the State's Attorney's Office "coerced, physically abused and charged [them] with the murders and/or obstruction of justice to force their 'cooperation' with the State's investigation."

¶ 136        We agree with defendants that R. Jacquez's assertion of his fifth amendment right rendered him unavailable at trial. It is well-settled that no amount of diligence can force a witness to

49

violate their fifth amendment right to avoid self-incrimination if the witness does not choose to do so. See, *e.g.*, *People v. Molstad*, 101 Ill. 2d at 135 (witness asserting fifth amendment right was deemed unavailable); *Edwards*, 2012 IL 111711, ¶ 38 (witness asserting fifth amendment right was deemed unavailable); *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 54; (witness asserting fifth amendment right was deemed unavailable); *People v. Henderson*, 2014 IL App (2d) 121219 (victim was deemed unavailable at trial where he invoked his fifth amendment right); *People v. Rosalez*, 2021 IL App (2d) 200086, ¶ 54 (witness who pled guilty on accountability theory was still protected by fifth amendment right and therefore unavailable).

¶ 137     In addition, we find that defendants' allegations of State coercion and affiant's averments of fear of State retaliation are sufficient to deem witnesses Gutierrez, Guzman, and V. Hodge unavailable to testify at trial. Newly discovered evidence includes testimony from a witness who "essentially made himself unavailable as a witness" out of fear of retaliation (*Ortiz*, 235 Ill. 2d at 334) or who was made unavailable through threats or intimidation to not testify. *People v. White*, 2014 IL App (1st) 130007, ¶¶ 20-22; *People v. Fields*, 2020 IL App (1st) 151735, ¶ 47 (witness was unavailable where "defendant had no reason to suspect that the reason for her false identification in the first place was threats and intimidation by the police"). For example, in *Harper*, 2013 IL App (1st) 102181, ¶ 42, the witness's affidavit "attested that his trial testimony was a lie and that police officers threatened him to obtain the testimony." This court found, "[c]learly, due diligence could not have compelled [the witness] to testify truthfully." *Harper*, 2013 IL App (1st) 102181, ¶ 42, see also *People v. Smith*, 2015 IL App (1st) 140494, ¶ 19 ("no amount of due diligence would have allowed [defendant] to secure [the eyewitness'] recantation of his identification prior to trial"). Here, Gutierrez, Guzman, and V.

50

Hodge have averred that they were baselessly arrested for participating in the offense, were threatened, physically abused by the police, and feared being prosecuted for the murders. The legitimacy of these affiants' fears and whether they rendered these witnesses unavailable to testify at trial should be ascertained at an evidentiary hearing to determine their credibility. *Rosalez,* 2021 IL (App) 200086, ¶ 126.

¶ 138    Second, defendants argue that the affidavits of Gomez and Padilla, who testified at trial, but later recanted parts of their testimony in their affidavits, are newly discovered because their affidavits contradict their trial testimony. The State does not contest that in certain circumstances, the affidavit of a witness who recants their trial testimony may be considered newly discovered. See, *e.g.*, *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 53 (a recantation of trial testimony may be considered new evidence, even though a defendant may know the witness to be perjuring himself or herself, where the defendant did not have evidence available at the time of trial to demonstrate the witness was lying); *Harper*, 2013 IL App (1st) 102181, ¶ 42 (where witness attested that his trial testimony was a lie and that police officers threatened him to obtain the testimony, the affidavit was newly discovered because, "clearly, due diligence could not have compelled [witness] to testify truthfully at the first trial"). Here, neither Soto nor Ayala had evidence to demonstrate that Gomez was lying at trial, nor could they establish, as Gomez now claims, that the State's actions induced her false testimony. Accordingly, we find Gomez's affidavit constitutes newly discovered evidence.

¶ 139    With respect to Padilla's affidavit, the State argues that it cannot be considered newly discovered because Soto submitted an affidavit from Padilla recanting his trial testimony that he could not identify the shooters with Soto's initial postconviction petition. The State is correct that "Typically, evidence of which the defendant was aware in earlier postconviction

51

proceedings will not be considered newly discovered." *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 114; *People v. Snow*, 2012 IL App (4th) 110415, ¶ 21 (evidence available at earlier posttrial proceeding was not newly discovered). In the unique circumstances presented in the case at bar, however, it would be "fundamentally unfair" to allow Soto's earlier presentation of this evidence to impair Ayala's claim of actual innocence because it is not technically "newly discovered." See *Warren*, 2016 IL App (1st) 090884-C, ¶ 130 (permitting introduction of affidavits that were available to petitioner during first postconviction proceeding). In addition, our supreme court has also considered evidence newly discovered even where defendant submitted an affidavit containing "substantially the same accounting of events" in a prior postconviction petition. *Ortiz,* 235 Ill. 2d at 334. Lastly, it is undisputed that Padilla's recantation of his trial testimony was not available to defendants at the time of trial. We therefore find Padilla's affidavit constitutes newly discovered evidence.

¶ 140    Third, defendants maintain that Palomo's affidavit is newly discovered. Here, we agree with defendants that although Palomo was known to defendants at the time of trial, as a codefendant, defendants could not compel his truthful testimony. Indeed, "No amount of diligence could have forced [Palomo] to testify that he, and not defendant was the shooter." *Rosalez*, 2021 IL App (2d) 200086, ¶ 115; *Molstad*, 101 Ill. 2d at 134–35. ("[C]odefendants did not present their testimony concerning [defendant's] whereabouts at trial because such testimony would have incriminated them. The testimony of [these] codefendants clearly qualifies as newly discovered evidence."). Moreover, the State does not contest that Palomo's affidavit is newly discovered, thereby effectively conceding this point.

¶ 141    Fourth, defendants contend that the affidavits of Abarca and Mullins are newly discovered. The State again responds that these witnesses were known and available to defendants at the

time of trial. However, as discussed above, defendants have alleged that their counsel labored under a prohibited conflict of interest, and that counsel's deficient and conflicted performance rendered these witnesses unavailable. We agree. Taking defendants' allegations as true, no amount of due diligence on the part of defendants could have compelled their conflicted counsel to call witnesses whose statements to police inculpated DeLeon's other client. See *People v. Triplett*, 2021 IL App (1st) 180546-U, ¶ 3 (where counsel was ineffective for failing to investigate and present a known witness, the postconviction affidavit from that witness was newly discovered); see also *Gomez v. Jaimet*, 350 F.3d 673, 680 (7th Cir. 2003) (noting that it would "defy reason" to block review of actual innocence claims on ground that trial counsel was aware of exculpatory evidence previously, when underlying claim of ineffectiveness is premised on trial counsel's very failure to use that known and available exculpatory evidence at trial).

¶ 142    Finally, defendants concede that the affidavits of Mora and Martinez do not constitute newly discovered evidence because these witnesses were both known to defendants and available to testify at the time of trial. Accordingly, they do not constitute newly discovered evidence. *Burrows*, 172 Ill. 2d 169, 180. In addition, the affidavit of Villagomez is not newly discovered because Villagomez was called as a defense witness at trial and testified to substantially similar facts as those contained his affidavit. Although Villagomez's affidavit adds some weight to defendants' claims that the State engaged in misconduct to secure their convictions, the State's tactics were apparently unsuccessful against Villagomez, and the content of his affidavit is not "newly discovered." See *Robinson,* 2020 IL 123849, ¶ 53.

53

¶ 143    In sum, the affidavits of R. Jacquez, Gutierrez, Guzman, V. Hodge, Padilla, Gomez, Palomo, Abarca and Mullins are newly discovered, but the affidavits of Mora, Martinez, and Villagomez are not.

¶ 144                        B. Materiality and Non-Cumulativeness

¶ 145    As noted, "material" means that the evidence is relevant and probative of the defendant's innocence. *Coleman*, 2013 IL 113307, ¶ 96. "Noncumulative" means that the evidence adds to what the jury heard. *Coleman*, 2013 IL 113307, ¶ 96. Before addressing this element, we note that every defendant has the constitutional right to defend against the theory of guilt upon which he was prosecuted, convicted, and sentenced. *People v. Millsap*, 189 Ill. 2d 155, 167 (2000). In the case at bar, this means Ayala has a constitutional right to defend against the State's charges that he ordered the shootings from a gang meeting in the basement of his home, and Soto has a constitutional right to defend against the State's charges that he carried out Ayala's orders using a handgun. Evidence that tends to disprove either of these theories is "material to the theory of guilt upon which defendant was prosecuted, convicted, and sentenced." *Rosalez*, 2021 IL App (2d) 200086, ¶ 149. Moreover, defendants were tried before a single jury and convicted of crimes that allegedly began in Ayala's basement and were allegedly completed by Soto in Pietrowski Park. Therefore, evidence that tends to disprove either theory is probative of *both* defendants' claims of actual innocence.

¶ 146    Defendants argue that the affidavits of R. Jacquez, Guzman, V. Hodge, and Palomo, all of whom, according to Cruz, were either in Ayala's home or attended the basement gang meeting are material and noncumulative because they tend to show that no basement gang meeting occurred at Ayala's home on the day of the Pietrowski Park shootings. The State responds, and the trial court agreed, that these affidavits are not material because "evidence that these

54

individuals did not attend the meeting is not evidence that no meeting took place." Both the State and the trial court misapprehend the actual innocence materiality standard. Our supreme court has "specifically rejected the total vindication or exoneration standard" and has explained that "evidence which is 'materially relevant' to a defendant's claim of actual innocence is simply evidence which tends to significantly advance that claim." *Robinson*, 2020 IL 123849, ¶ 55 (quoting *People v. Savory*, 197 Ill. 2d 203, 213 (2001)). Here, evidence that these witnesses did not attend the basement gang meeting as testified by Cruz significantly advances the claim that no such meeting took place, and that Ayala therefore could not have ordered the shootings from any such meeting. *Molstad,* 101 Ill. 2d at 135 (affidavits were material where, although the defendant offered alibi testimony at trial, the introduction of five codefendants' statements at the posttrial stage raised additional questions concerning the trial court's verdict).

¶ 147        The State next argues that the affidavits of R. Jacquez, Guzman, V. Hodge, and Palomo are cumulative because several witnesses testified at trial that they did not attend any basement gang meeting at Ayala's home or that they were present at the house and did not witness a gang meeting. We disagree. In *Ortiz*, our supreme court found that an affidavit supporting the defendant's alibi defense was not merely cumulative of the testimony of an alibi witness presented at trial, because it "added to what was before the factfinder." *Ortiz*, 235 Ill. 2d at 335. Similarly, here, testimony from additional alleged gang meeting participants denying any such meeting took place would have certainly added to factual picture presented to the jury. The affidavit of Palomo is also material and noncumulative because he admits that he participated in the shooting but avers he did not take any orders from defendants. Although the State argues that Palomo's assertion that he "operated on [his] own" contradicts the affidavits of other affiants who identified shooters other than Palomo, in context, his statement can

55

plausibly be read to imply that he acted without input or direction from defendants, not that Palomo was the *only* shooter. Accepted as true, this assertion is material and noncumulative because the jury did not hear this exculpatory testimony at trial. *People v. Woods*, 2020 IL App (1st) 163031, ¶ 51 ("Evidence is not cumulative if it adds to the information that was before the jury and raises additional questions concerning the jury's verdict.").

¶ 148     We also find that the affidavits of Padilla, Abarca, and Mullins are material and noncumulative. Affidavits identifying someone other than Soto as the handgun shooter, and as a corollary, denying that Soto was the handgun shooter are "highly probative" of Soto's innocence. *Rosalez*, 2021 IL App (2d) 200086, ¶ 129. The State argues that these witnesses' affidavits are not material because "Neither Abarca [nor] Mullins [] told police that he or she saw Rodriguez fire a handgun into the crowd at the park or identified Rodriguez as the shooter." To the contrary, Abarca averred, "I saw a tall white male carrying a rifle and [V. Rodriguez] carrying a handgun ***. I yelled at the shooters and [V. Rodriguez] then turned around, faced me, and fired a shot at me." Similarly, Mullins averred that he was talking to Limas when she was shot in the head and then "Everybody got down and the shooting stopped. I then looked to my right to see where the shots came from. They came from the gangway *** approximately 15-20 feet from where I was standing and *** well lit by a street lamp that was next to it. I saw [V. Rodriguez] who had a handgun, *** Palomo and [Cruz] who was carrying a rifle." Padilla likewise averred that he believed V. Rodriguez was one of the shooters, and told that to agents State's Attorneys' Office, who then coerced him into falsely testifying that he did not know who shot him.[8] Because the State's theory at trial was that there was only one

---

[8] We reject the State's contention that Padilla's affidavit is positively rebutted by the record. While Padilla's affidavit conflicts with his trial testimony, this is not the same as positively rebutting the record. See *Robinson*, 2020 IL 123849, ¶ 60 ("a conflict with the trial evidence is not the same as a finding that the evidence is positively rebutted"). Moreover, none of the physical evidence adduced at trial demonstrates that

handgun shooter, evidence from eyewitnesses who observed V. Rodriguez firing or carrying a handgun immediately after the shooting is certainly probative of Soto's innocence. *Rosalez*, 2021 IL App (2d) 200086, ¶ 130 ("Evidence that tends to prove that defendant was not the shooter is clearly material to the theory of guilt upon which defendant was prosecuted, convicted, and sentenced."). In addition, because no evidence connecting V. Rodriguez to the crime was presented at trial, this evidence cannot be considered cumulative. *Rosalez*, 2021 IL App (2d) 200086, ¶ 129 (affidavits identifying alternate suspect as the shooter were noncumulative, "as none of the evidence at trial directly implicated [alternate suspect].") Lastly, we note that the trial court made prohibited credibility determinations when describing these affidavits with gratuitous skepticism, referring to Mullins as a "convicted murderer," describing Abarca's averments as "curious," and calling into question Padilla's motivations for assisting defendants. "The possibility that [affiants] might not be as credible as the State's witness is simply not a basis for dismissal at the second stage." *Wilson*, 2022 IL App (1st) 192048, ¶ 76.

¶ 149                                     C. Conclusiveness

¶ 150        As noted, evidence is of a conclusive character where, when considered along with the trial evidence, it would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. The new evidence need not be completely dispositive. *Coleman*, 2013 IL 113307 ¶ 97. Rather, "[p]robability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Coleman*, 2013 IL

---

Padilla's affidavit is false. See *Harper*, 2013 Il App (1st) 102181, ¶ 44 (affiant's confession was not positively rebutted by the record where physical evidence at trial was not so conclusive as to as to positively rebut affiant's version of events); *Sanders*, 2016 IL 118123, ¶ 48 (affiant's attestation that he shot victim just once was positively rebutted by the record where physical evidence adduced at trial showed the victim was in fact shot twice). Although Padilla was shot from behind, he avers that he observed the shooters before turning.

113307 ¶ 97. The question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Coleman*, 2013 IL 113307 ¶ 97; *People v. Robinson*, 2020 IL 123849, ¶ 48. Taken together, the newly discovered, material, non-cumulative evidence described above easily meets this standard. There was no physical evidence linking the defendants to the crimes, and the only witness to testify regarding defendants' involvement was the highly incentivized Cruz. Affidavits from over half a dozen witnesses who contradict elements of Cruz's account are sufficiently conclusive to alter the result on retrial, particularly given the weakness of the State's case at trial. See, *e.g.*, *Wilson*, 2022 IL App (1st) 192048 ¶ 76 (affidavit which "provide[d] significant corroboration" for defendant's assertion that he did not commit the offense was of conclusive character); *Rosalez*, 2021 IL App (2d) 200086, ¶ 133 (affidavit evidence identifying alternate suspect as true offender satisfied conclusive character prong); *Willingham*, 2020 IL App (1st) 162250, ¶ 35 (affidavit from new eyewitness who corroborated the defense at trial sufficient to cast trial in new light); *Woods*, 2020 IL App (1st) 163031, ¶¶ 51-53 ("first-person account of the incident that directly contradicts the trial testimony of the State's primary eyewitnesses" could be of such conclusive character as to change the result on retrial). Accordingly, Soto and Ayala are entitled to a third-stage evidentiary hearing regarding their actual innocence claims.

¶ 151                            VI. Ayala's Proportionate Penalties Clause Claim

¶ 152          Ayala also appeals from the trial court's September 24, 2020, order denying him leave to file a successive postconviction petition in which he raised a youth-based sentencing claim under the proportionate penalties clause of the Illinois Constitution. Ill. Const. 1970, art. I, § 11. The trial court found Ayala had failed to establish "cause" because he could have

58

supplemented his initial petition with this claim, but did not, and failed to establish "prejudice" because Ayala's petition only made allegations concerning the evolving science on young adult brains generally and did not make allegations regarding Ayala's specific facts and circumstances. The trial court further found that Ayala's natural life sentence does not shock the moral sense of the community where "the circumstances of [Ayala's] offenses reveal [Ayala] to be a moving force in the gestation of the crime." For the reasons that follow, we affirm the judgment of the trial court.

¶ 153        As noted, prior to commencing a successive proceeding, a defendant must obtain leave of court to file his or her petition. *People v. Robinson*, 2020 IL 123849, ¶ 43. At this threshold stage, when a defendant seeks leave to file, he or she is required to demonstrate only "a *prima facie* showing of cause and prejudice." *People v. Bailey*, 2017 IL 121450, ¶ 24. To show cause, "a defendant must identify an objective factor that impeded his ability to raise the claim in his initial petition." *People v. Davis*, 2014 IL 115595, ¶ 14. To show prejudice, "a defendant must demonstrate that the claim so infected the trial that the resulting conviction or sentence violated due process." *Edwards*, 2012 IL 111711, ¶ 25. If leave to file is granted, the petition will be docketed for second-stage proceedings. *Sanders*, 2016 IL 118123, ¶ 28; *People v. Jackson*, 2015 IL App (3d) 130575, ¶ 14 ("When a defendant is granted leave to file a successive postconviction petition, the petition is effectively advanced to the second stage of postconviction proceedings."). "[L]eave of court to file a successive postconviction petition should be denied only where it is clear from a review of the petition and attached documentation that, as a matter of law, the petitioner cannot set forth a colorable claim ***." *Sanders*, 2016 IL 118123, ¶ 24.

59

¶ 154    To determine whether a defendant has made a *prima facie* showing of cause and prejudice, we apply a *de novo* standard of review. *Bailey*, 2017 IL 121450, ¶ 13. As noted, *de novo* consideration means that a reviewing court performs the same analysis that a trial judge would perform. *Van Dyke*, 2020 IL App (1st) 191384, ¶ 41.

¶ 155    On appeal, Ayala first argues he has established cause "because the law was unsettled on the all-important question of whether a trial court may consider an offender's young age in determining whether a mandatory natural life sentence violates the proportionate penalties at the time Ayala filed his postconviction petition and supplemental claims." We thus begin our analysis of cause with an overview of this evolving area of law.

¶ 156    The eighth amendment, which sets the floor for constitutional sentencing protections under Illinois law, 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). In *Miller*, the United States Supreme Court found that a sentence of mandatory life without parole for offenders under 18 years old violates the eighth amendment and announced several factors that a sentencing court must consider in mitigation before imposing a natural life sentence on a juvenile. *Miller*, 567 U.S. at 465, 483. As defendant concedes, however, the rule of *Miller* does not apply to the case at bar because defendant was not legally a juvenile at the time of his offense; he was over 18 years old. In *People v. Harris*, 2018 IL 121932, our supreme court reaffirmed under 18 as the age cutoff for juvenile sentencing protections in the eighth amendment context. *Harris*, 2018 IL 121932, ¶ 61 (in the eighth amendment context, "for sentencing purposes, the age of 18 marks the present line between juveniles and adults").

¶ 157    However, where, as here, a young adult raises an as-applied challenge, Illinois courts have routinely considered their sentencing claims under the proportionate penalties clause of our

60

Illinois Constitution. *E.g., People v. Minniefield*, 2020 IL App (1st) 170541, ¶¶ 37-38 (considering a 19-year-old defendant's as-applied sentencing claim under the proportionate penalties clause rather than the eighth amendment); *Franklin,* 2020 IL App (1st) 171628, ¶ 51 (18-year-old defendant); *People v. Johnson*, 2020 IL App (1st) 171362, ¶¶ 13-31, (19-year-old defendant); *People v. Ross*, 2020 IL App (1st) 171202, ¶ 20 (19-year-old defendant).

¶ 158    The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "The purpose of the proportionate penalties clause is to add a limitation on penalties beyond those provided by the eighth amendment and to add the objective of restoring the offender to useful citizenship." *Minniefield*, 2020 IL App (1st) 170541, ¶ 35; see *Franklin*, 2020 IL App (1st) 171628, ¶ 55. Thus, the proportionate penalties clause goes further than the eighth amendment in offering protection against oppressive penalties. *Minniefield*, 2020 IL App (1st) 170541, ¶ 35; *People v. Clemons*, 2012 IL 107821, ¶ 39; *People v. Fernandez*, 2014 IL App (1st) 120508, ¶ 63 ("the Illinois Constitution places greater restrictions on criminal sentencing than the eighth amendment's prohibition"). "Unlike other constitutional provisions affecting criminal defendants, these two provisions—the eighth amendment and the proportionate penalties clause—are not in lockstep." *Franklin*, 2020 IL App (1st) 171628, ¶ 55; see *Savage*, 2020 IL App (1st) 173135, ¶ 65.

¶ 159    By way of the proportionate penalties clause, our supreme court has held that young adults may rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support an as-applied challenge to a life sentence. See *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (19-year-old defendant "is not necessarily foreclosed from renewing his as-applied

challenge in the circuit court" pursuant to the Act); *Harris*, 2018 IL 121932, ¶¶ 59-61. Recently, in *House*, 2021 IL 125124, ¶¶ 29-31, our supreme court once again found that a young adult may bring an as-applied challenge under the proportionate penalties clause based on a developed evidentiary record as to how the "science concerning juvenile maturity and brain development applies equally to young adults, or to petitioner specifically."

¶ 160     However, these decisions do not constitute cause for Ayala's failure to bring his proportionate penalties claim earlier. Our supreme court's focus, when considering cause in the juvenile and young adult sentencing context, has been on whether the argument was "available" to earlier counsel. See *People v. Davis*, 2014 IL 115595, ¶ 42 ("*Miller's* new substantive rule constitutes 'cause' because it was not available earlier"). Contrary to Ayala's argument on appeal, *Thompson*, which opened the door to as-applied *Miller*-style sentencing claims for young adult defendants, was available to Ayala when he filed his supplemental postconviction claim in 2016, and both our supreme court's decision in *Harris* and this court's decision in *People v. House*, 2019 IL App (1st) 110580-B, were available to Ayala before the trial court ruled on his initial postconviction petition in September 2020. Accordingly, because Ayala could have supplemented his initial petition with a proportionate penalties claim in reliance on this developing law, he has not established cause for failing to do so.

¶ 161     Ayala alternatively argues that his postconviction counsel failed to provide a reasonable level of assistance by neglecting to supplement Ayala's petition with a meritorious proportionate penalties claim, which, according to Ayala, should satisfy the cause element of the cause-and-prejudice test. However, we find Ayala's postconviction counsel provided Ayala with the reasonable level of assistance required by the Act. Accordingly, postconviction

62

counsel's decision not to supplement Ayala's initial petition with this claim does not constitute cause.

¶ 162    "Because the right to counsel in postconviction proceedings is derived from statute rather than the Federal or State Constitutions, postconviction petitioners are guaranteed only the level of assistance provided for by the Act. That assistance has been defined by this [supreme] court to mean a 'reasonable' level of assistance." *People v. Flores*, 153 Ill. 2d 264, 276 (1992) (citing *People v. Wright*, 149 Ill.2d 36, 64 (1992)). Although our supreme court has not explicitly set a standard for determining whether postconviction counsel has provided "a reasonable level of assistance," this court has applied a "*Strickland*-like" analysis for evaluating counsel's performance. *People v. Zareski*, 2017 IL App (1st) 150836, ¶¶ 58-59. As noted, under that standard, we evaluate whether the defendant has demonstrated prejudice, that is, whether there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.

¶ 163    In the case at bar, the trial court's order demonstrates that even if Ayala's postconviction counsel had supplemented his petition with a proportionate penalties claim earlier, it would not have changed the outcome. Indeed, despite finding a lack of cause, the trial court continued to assess the prejudice prong of the cause-and-prejudice test and found that Ayala could not establish prejudice. The court further found that, based on the circumstances of the crimes for which Ayala was convicted and sentenced, his sentence did not violate the proportionate penalties clause as a matter of law. In other words, even if postconviction counsel had supplemented Ayala's initial petition with this claim, Ayala has not shown a reasonable probability that his claim would have succeeded.

¶ 164    Moreover, we note that although Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) requires appointed postconviction counsel to certify that they "examined the record of the proceedings at the trial" and made "any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions," there is no requirement that postconviction counsel amend a defendant's petition to include a specific claim. *People v. Spreitzer,* 143 Ill. 2d 210, 221. Accordingly, we find that postconviction counsel did not fail to provide Ayala with the "reasonable level of assistance" required by the Act, and Ayala cannot establish cause on this basis. See *Flores*, 153 Ill. 2d at 280 (attorney error short of ineffective assistance of counsel does not constitute cause).

¶ 165    For the reasons set forth above, we affirm the trial court's denial of Ayala's motion for leave to file a successive petition raising a youth-based sentencing claim under the proportionate penalties clause.

¶ 166                                    CONCLUSION

¶ 167    For the foregoing reasons, we reverse the trial court's October 9, 2019, order dismissing defendants' 2015 petitions, and remand for a third-stage evidentiary hearing at which, consistent with the limitations set forth in this opinion, defendants may present their claims of actual innocence and trial counsel conflict of interest. We affirm the trial court's September 24, 2020, order denying Ayala leave to file his successive petition raising a youth-based proportionate penalties claim.

¶ 168    No. 1-19-2484, Reversed and remanded with directions.

¶ 169    No. 1-20-0722, Reversed and remanded with directions.

¶ 170    No. 1-20-1175, Affirmed.

---

**No. 1-19-2484**

---

| | |
|---|---|
| **Cite as:** | *People v. Ayala*, 2022 IL App (1st) 192484 |

---

| | |
|---|---|
| **Decisions Under Review:** | Appeal from the Circuit Court of Cook County, No. 81 CR 7761; the Hon. Timothy J. Joyce, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellants:** | Jennifer Bonjean, of Bonjean Law Group, of New York, NY, for appellant Ayala; |
| | Debra Loevy, of the Exoneration Project, of Chicago, for appellant Soto. |

---

| | |
|---|---|
| **Attorneys for Appellees:** | Kimberly M. Foxx, State's Attorney, of Chicago (John E. Nowak, Enrique Abraham, Joseph Alexander, and Paul E. Wojcicki, Assistant State's Attorneys, of counsel), for the People. |