2023 IL App (1st) 221389-U

FOURTH DIVISION
Order filed: October 19, 2023

No. 1-22-1389

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 97 CR 8756 |
| ERIC VANN, | ) ) | Honorable Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Rochford and Justice Martin concurred in the judgment.

**ORDER**

¶ 1   *Held*: The defendant's newly discovered evidence of actual innocence is both material and of a conclusive character and sufficient to survive second-stage dismissal when the evidence consists of an affidavit from an eyewitness stating that a codefendant actually committed the crime for which the defendant was convicted, and the weighing of that new evidence against the other evidence of guilt, including the defendant's own inculpatory statement, is a matter reserved for third-stage proceedings.

¶ 2     Appellant Eric Vann ("the defendant") appeals the circuit court's second-stage dismissal of his successive petition for postconviction relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)). In the petition, the defendant raised a claim of actual innocence based on an affidavit from an eyewitness asserting that another person had committed the murder for which the defendant was convicted. The circuit court dismissed the petition on the basis that the defendant had not shown that this new testimony would probably change the result on retrial in light of the other evidence of guilt. Because the circuit court's analysis involved an inappropriate weighing of the evidence at the second stage of proceedings and because the defendant has made a substantial showing that the new evidence is of a conclusive character, we reverse the dismissal of the petition.

¶ 3     On February 18, 1997, Gracie Binion was shot and killed by a stray bullet from an apparent gang-related shooting. The defendant was arrested three days later on February 21. Following his arrest, the defendant was identified in a lineup and later signed a written statement admitting to having been the shooter.

¶ 4     A few weeks later, the defendant, who was then seventeen years old, filed a motion to suppress his written statement, asserting that he was never given his *Miranda* rights and that the statement was involuntary and coerced through police intimidation, deception, and pressure. The circuit court held a hearing on the motion, at which the following testimony was produced.

¶ 5     Sergeant James Boylan testified that he and several other officers arrested the defendant around 11:30 p.m. on February 21. The defendant was brought to a police station, placed in a lineup, and then brought to an interview room. Boylan read the defendant his *Miranda* rights and then spoke with the defendant for approximately ten to fifteen minutes. At about 12:30 a.m.,

Boylan returned to the room, this time with Assistant State Attorney Vickie Klegman. According to Boylan, Klegman then again read the defendant his rights, and the defendant indicated that he understood them.

¶ 6     Boylan testified that the defendant agreed to speak with him and Klegman and that, when given several options for how to provide them with a statement, the defendant elected to provide a written statement. The defendant ultimately signed that statement at around 4:00 a.m. Boylan denied doing anything to coerce or deceive the defendant, and specifically denied ever telling the defendant that signing the statement was effectively a not-guilty plea, denied pounding his hand with his fist, and denied questioning the defendant constantly. Boylan also testified that the written statement that the defendant signed at 4:00 a.m. contained printed *Miranda* warnings and that the defendant's signature was present under those warnings.

¶ 7     Klegman's testimony largely echoed Boylan's. She testified that she first spoke with the defendant around 12:30 a.m., at which point she gave the defendant his *Miranda* warnings and asked if he wished to give a statement. Klegman gave the defendant three options, one of which was for Klegman to write down a summary of what the defendant told her. The defendant chose that option. Klegman then asked Boylan to leave the room, at which point she asked the defendant how he was doing and how he was being treated. According to Klegman, the defendant "indicated that he was fine." Klegman explained to the defendant that she was going to leave to speak with other people in the station and would return later to take his statement.

¶ 8     Klegman testified that she then took written statements from two other people in the interim and returned to take the defendant's statement at 4:00 a.m. At that time, she again read the

defendant his rights as they were printed on the top of the statement form, and the defendant signed an acknowledgement. She then took the defendant's statement with Boylan present.

¶ 9 The defendant, however, gave a very different account of events. He testified that, following the lineup, two officers brought him into an interview room, where they were joined by an Assistant State's Attorney. One officer questioned the defendant for approximately twenty minutes. According to the defendant, there was an officer next to the officer who was questioning him and another officer "in the back." There was always at least one officer in the room at all times. The defendant stated that "every time the officer that questioned me another officer came, just constantly came closer towards me, just telling me 'just say you shot,' 'just say this' and I was confused." The defendant also claimed that he was handcuffed to a chair during questioning.

¶ 10 According to the defendant, while Boylan stood about an arm's length away from him, the officer standing to the side yelled at him in a threatening manner. This other officer also repeatedly hit his fist into his palm in a similarly threatening manner. The defendant testified that he was never read his *Miranda* rights, but he acknowledged that he generally understood what those rights were. The defendant further claimed that Boylan told him that, if he signed the written statement, "my plea would be not guilty towards the statement that they told me to sign." The defendant also stated that "[they] told me it would be for my benefit if I signed the papers if I didn't know nothing concerning this if my plea would be not guilty towards what they was questioning me for."

¶ 11 Following this testimony, the circuit court denied the defendant's motion to suppress, finding that the defendant had been advised of his rights and that the defendant gave the written statement freely and voluntarily.

¶ 12    The case eventually proceeded to a trial, where the defendant and his codefendant, Michael Taylor, were tried jointly. The defendant elected a jury trial and Taylor elected a bench trial.

¶ 13    Phylan Jackson testified that she had known Taylor for eight years and the defendant for five years. At the time of trial, she was in a relationship with Taylor, who was the father of her child. On February 18, 1997, she was walking home from school when she saw five or six boys standing on the corner of 61st Street and S. Martin Luther King Drive in Chicago. She heard one of the boys say, "Look at that n**** standing right there." She then saw the defendant standing across the street by an alley off of Vernon Avenue. About fifteen seconds later, Jackson heard gunshots, and she then started running down 61st Street toward Eberhart Avenue. After she heard the shots, she saw the defendant walking down Vernon. Jackson never saw the defendant holding or pointing a gun, and she could not tell where the gunshots had come from.

¶ 14    Michael Cudmore testified that he was in a liquor store at the corner of 61st Street and King Drive at the time of the shooting. While he was in the store, he heard two gunshots. He then stepped outside and heard four more shots. He observed the person who fired the shots and described him as a black male wearing a blue down coat, baggie pants, and sneakers. However, Cudmore did not believe that he got a good enough look at the suspect's face to make a reliable identification. Cudmore testified that the shooter was standing on the sidewalk and was not in an alleyway. The shooter fired from east to west and then turned and ran to the east towards Vernon Avenue.

¶ 15    Lindaryl Byrd testified that, at the time of trial, he was in prison for robbery and aggravated battery, and he admitted to having prior drug charges. In February 1997, Byrd was a member of the Black Disciples gang ("BD"). He knew the defendant and Taylor and testified that they were

members of a rival gang, the Gangster Disciples ("GD"). According to Byrd, the two gangs were "shooting all the time."

¶ 16    Byrd testified that, on February 18, 1997, he was on the corner of 61st Street and King Drive when Taylor got off the bus coming home from school, and the two exchanged words and threw gang signs. Byrd saw Taylor holding a "silver .380 automatic" handgun, and Taylor said that he was going to "come back up there and shoot." Byrd testified that Taylor then left and returned twenty or thirty minutes later with the defendant, who was driving his red two-door car. According to Byrd, Taylor stood on the corner and tried to distract Byrd's group, while the defendant came "out the alley and shot four times." Byrd then saw both Taylor and the defendant run back towards Eberhart Avenue.

¶ 17    On cross-examination, Byrd denied throwing bottles at the defendant's car, as the defendant had claimed in his written statement, although he acknowledged that he had on another occasion. There was also some confusion over whether Byrd saw the defendant actually driving the red car. When asked when he first saw the defendant, Byrd initially suggested that he only saw the car and not the driver: "[The defendant] pulled up. I didn't see him. I knew he drove a red two-door car. I guess he parked on Vernon, went to some little gangway over there and came out the alley, fired about four shots." When pressed on this and asked whether he ever saw the defendant in the car, Byrd replied, "I seen him because he came out the alley we was looking. He fired four shots ran back towards Eberhart."

¶ 18    Chicago Police Department forensic investigator John Karalow next testified that he recovered four .25 semiautomatic cartridge cases from the sidewalk near 405 E. 61st Street. And

Illinois State Police forensic scientist Barbara Wilkins further testified that she tested five cartridge cases for fingerprints but was unable find any.

¶ 19    Sargeant James Boylan testified that on February 20, 1997, he and his partner, Detective Michael McDermott, received information regarding the homicide at 61st and King and attempted to locate Taylor. When Boylan learned that Taylor was at school, he and McDermott picked up Taylor and brought him to the police station. Following a discussion with Taylor, Boylan attempted to speak with Phylan Jackson, and he eventually spoke with her on the phone around 9:00 p.m. Based on his interactions with Taylor and Jackson, Boylan then sought to find the defendant. He went to the apartment where the defendant was staying, placed him under arrest, and brought him back to the station.

¶ 20    Boylan testified that he placed the defendant in an interview room, removed his handcuffs, and left the room. Boylan returned twenty minutes later, around midnight, with McDermott. Boylan then read the defendant his *Miranda* rights and explained why he had been arrested. According to Boylan, the defendant acknowledged his rights and agreed to speak with them. The defendant then provided a narrative account of what had happened on the night of the shooting. In Boylan's words, "[the defendant] stated that he had observed Michael Taylor on the street and Michael Taylor had told him that BD had been messing with him earlier in the day. He said later he heard there had been a shooting up on 61st Street. After that he encountered Mike Taylor again who handed him a silver handgun and asked him to put it up or hide it for him."

¶ 21    Boylan then left and had a conversation with Assistant State Attorney Vickie Klegman. The two returned to the interview room around 12:30 a.m., at which point Klegman interviewed the defendant.

¶ 22    Klegman testified that she was called into the police station around 8:30 p.m. on February 21, 1997. When she arrived, she spoke with Boylan and McDermott, and around 12:30 a.m. she interviewed the defendant with both detectives present. According to Klegman, the defendant was not handcuffed when she entered the room. She introduced herself to the defendant and explained her role, including that she was a prosecutor and not his lawyer. She also informed the defendant of his *Miranda* rights, following which he agreed to speak with her. They spoke for about twenty minutes, at which point Klegman gave the defendant three options for providing a statement, and he elected to provide a statement in writing. Klegman then asked Boylan to leave the room so that she could speak to the defendant alone. She asked how he had been treated and he responded that he had been treated "fine." She asked if he wanted anything to eat or drink or if he wanted to use the restroom, and he declined. Klegman explained that she was going to leave to speak with some other people and would return later, and the defendant said that was fine.

¶ 23    Klegman returned to the room at 4:00 a.m. and took the defendant's statement with both detectives present. Before beginning the statement, Klegman again read the defendant his *Miranda* rights from a preprinted section of the statement form. The defendant said he understood his rights and signed an acknowledgement on the form. She then wrote down the defendant's account of the shooting, and, when they had finished, she read it aloud back to him and allowed him to make any corrections. Klegman then took a Polaroid photograph of the defendant and signed the statement.

¶ 24    Klegman then read the statement aloud for the court and the jury. In it, the defendant stated that on February 18, 1997, he was driving his two-door, rust colored, 1977 Cutlass, with someone named Will Smith in the passenger seat. The two were driving near 61st Street and King Drive for about fifteen minutes when the defendant saw Michael Taylor on the corner of 61st and Eberhart.

They drove up to Taylor, who was then standing on the passenger side by Smith. Taylor told the defendant that the BDs were trying to get him when he got off of the bus coming home from school. Taylor told the defendant to be careful. Taylor then showed the defendant and Smith a gun that he was carrying. The defendant and Smith then drove away. The defendant dropped Smith off near a store on 63rd Street and Eberhart, and the defendant then drove home and parked his car in a vacant lot on Vernon. The defendant stayed at his house for ten to fifteen minutes, then left.

¶ 25    The defendant walked straight up Vernon to 61st Street, then turned on to 61st and walked toward Eberhart. When he reached the corner of 61st and Eberhart, the defendant again saw Taylor, who told the defendant to "hold it down." Taylor then gave the defendant a chrome handgun. A BD then threw a bottle and hit the defendant's car.

¶ 26    After Taylor handed the defendant the gun, the defendant walked down Eberhart towards 62nd Street. He then walked up 62nd Street to an alley between Vernon and King Drive, and then down the alley towards 61st Street. He reached the mouth of the alley where it meets 61st Street, and he saw a group of BDs hanging out on the corner. The defendant then fired the gun two to three times toward the group of BDs. He then walked back down the alley to 62nd Street, before turning down 62nd Street and into an alley between Vernon and Eberhart. The defendant then hid the gun between two bricks in the alley. He went back the next day to retrieve the gun because he thought that Taylor would want it back. He hid the gun under his god-sister's mattress.

¶ 27    The State then rested its case, and the defendant called three witnesses to testify about the circumstances surrounding his arrest. That testimony is not particularly relevant to the issues on appeal and, therefore, need not be recited.

¶ 28    Following the presentation of evidence, the jury convicted the defendant of first-degree murder, and he was sentenced to fifty years in prison. This court affirmed his conviction and sentence on appeal. The defendant then filed four petitions for postconviction relief in 2004, 2006, 2007, and 2013, all of which were dismissed or denied.

¶ 29    In 2015, the defendant filed the present successive petition for postconviction relief in which he raised a single claim of actual innocence. The defendant asserted that he had received a letter from Phylan Jackson in March 2015 in which Jackson stated that she knew that it was actually Taylor, and not the defendant, who shot and killed Binion. The defendant alleged that he asked Jackson to swear to that information in an affidavit, and Jackson did. The defendant attached a copy of both the letter and the affidavit to his petition. The affidavit stated the following:

> " I am *** [Phylan Jackson] and I am signing and sending this affidavit to *** [the defendant] because he's in prison for a crime that he did not commit. I testified at *** [the defendant's] trial and due to [the] time span[] I can not recall every single word I said. I can, however, recall that I never mentioned the fact that I saw my boyfriend at the time, Michael Taylor[,] shoot a gun in the direction of the woman that got shot that day. I chosed [*sic*] not to mention what I saw to anyone because[,] after I told Michael that I saw him shoot the lady[,] Michael told me to never ever tell anyone what I saw and because I feared and loved him, I kept my mouth shut for all of these years. Michael died a few years back and I decided to reach out to *** [the defendant] after listening to a discussion on one of the Chicago news channels about the violence occurring in Chicago; my conscious [*sic*] I cannot hold this any longer. After I contacted *** [the defendant,] he seemed skeptical and

asked that I send him a sworn affidavit of which I am doing. Also I want to tell the judge that I am sorry that I did not speak up earlier."

¶ 30 The defendant later filed a supplemental petition seeking sentencing relief pursuant to *People v. Buffer*, 2019 IL 122327. However, he later conceded and abandoned that issue following the decision in *People v. Dorsey*, 2021 IL 123010.

¶ 31 The circuit court appointed counsel for the defendant and advanced the petition to the second stage. At that point, the State moved to dismiss the petition. Following a hearing, the circuit court granted the State's motion, finding that the defendant failed to prove that Jackson's proffered testimony would be conclusive and probably change the result if presented in a new trial. This appeal follows.

¶ 32 The Act provides for a three-stage review of petitions for postconviction relief. *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 95. When a defendant files a successive petition, he must obtain leave of the court to file. *Id.* ¶ 96. If the court grants leave to file, the petition is advanced to the second stage of proceedings. *Id.* At the second stage, the State may either file an answer to the petition or a motion to dismiss. *Id.* ¶ 97. " 'Where the State seeks dismissal of a postconviction petition instead of filing an answer, its motion to dismiss assumes the truth of the allegations to which it is directed and questions only their legal sufficiency.' " *Id.* (quoting *People v. Miller*, 203 Ill. 2d 433, 437 (2002)). The circuit court "must then determine 'whether the petition and any accompanying documentation make a substantial showing of a constitutional violation.' " *Id.* (quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)). If the defendant makes such a substantial showing, the petition is advanced to the third stage, where the circuit court "acts as factfinder,

determines witness credibility and the weight to be given particular testimony and evidence, and resolves any evidentiary conflicts." *Id.* (quoting *People v. Domagala*, 2013 IL 113688, ¶ 34).

¶ 33    When a petition is dismissed at the second stage, our review concerns a pure question of law that we conduct *de novo*. *Id.* ¶ 98. "Since this stage involves purely a legal determination, '[t]he inquiry [at the second stage] does not require the trial court to engage in any fact-finding or credibility determinations.' " *Id.* (quoting *People v. Dupree*, 2018 IL 122307, ¶ 29) (alteration retained). " 'Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or "show" a constitutional violation.' " *Id.* (quoting *Domagala*, 2013 IL 113688, ¶ 35). For a claim asserting actual innocence, the defendant must make a substantial showing that the evidence supporting his claim is "newly discovered, material and not merely cumulative, and of such conclusive character that it would probably change the result on retrial." *People v. Sanders*, 2016 IL 118123, ¶ 46 (citing *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009)).

¶ 34    The State in this case argues that the defendant's petition fails to satisfy the materiality and conclusive-character elements of the actual-innocence standard. First, regarding materiality, the State contends that the information contained in Jackson's affidavit would not be material because her statement that she saw Taylor fire a gun merely implicates Taylor and does not exculpate the defendant. In the State's words, Jackson's new account "suggests that Taylor may have been a shooter but does not say that petitioner was *not* a shooter." (Emphasis in original.) But we do not agree with the State's view of Jackson's affidavit.

¶ 35    "Material means the evidence is relevant and probative of the petitioner's innocence." *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Smith*, 177 Ill.2d 53, 82–83 (1997)).

And Jackson's affidavit meets that standard. Contrary to the State's assertion, while Jackson does say that she saw "Taylor shoot a gun in the direction of the woman that got shot," implicating Taylor as, in the State's words, "a shooter," Jackson also states that she "saw *** [Taylor] shoot the lady" and that the defendant was "in prison for a crime that he did not commit." When we view these statements together, it seems clear that Jackson is not merely implicating Taylor; rather, she is saying that it was Taylor, and not the defendant, who shot Binion. Accordingly, we have little trouble concluding that her new statement is material, as it is probative of the defendant's innocence.

¶ 36    Second, the State also contends that the defendant failed to show that Jackson's affidavit would be conclusive. Evidence is conclusive if, "when considered along with the trial evidence, [it] would probably lead to a different result." *People v. Robinson*, 2020 IL 123849, ¶ 47 (citing *Coleman*, 2013 IL 113307, ¶ 96). When analyzing conclusiveness, the ultimate question "is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48 (citing *Coleman*, 2013 IL 113307, ¶ 97).

¶ 37    The State argues that the statements in Jackson's affidavit are not conclusive because they do not undermine the evidence that implicated the defendant in the shooting, namely Jackson's testimony that the defendant was at the scene of the shooting, Byrd's testimony that the defendant was the shooter, and the defendant's own statement to police that he fired two or three shots in the direction of the BDs. However, the State's analysis of this issue is flawed. Boiled down, the State's argument is essentially weighing Jackson's new statements against the other evidence and concluding that Jackson's new account is not sufficient to outweigh the other evidence of guilt

and, therefore, would not change the result. But that is not how we are supposed to examine the evidence at the second stage of a postconviction proceeding.

¶ 38    At the second stage, we are not concerned with making credibility determinations or weighing the new evidence against the old. Rather, that is the exclusive domain of the circuit court during the third stage of proceedings. See *Domagala*, 2013 IL 113688, ¶ 34 (stating that is the circuit court's duty at the third stage "to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts").

> "At the dismissal stage of a post-conviction proceeding, all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true. The inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations. The Act contemplates that such determinations will be made at the evidentiary stage, not the dismissal stage, of the litigation. Due to the elimination of all factual issues at the dismissal stage of the post-conviction proceeding, a motion to dismiss raises the sole issue of whether the petition being attacked is proper as a matter of law."
>
> *People v. Coleman*, 183 Ill. 2d 366, 385 (1998).

Indeed, at the second stage, we must accept the new evidence as true and assume that a hypothetical jury would believe it, unless the new evidence is positively rebutted by the record. See *Sanders*, 2016 IL 118123, ¶ 48 (concluding that a codefendant's recantation was positively rebutted by the trial record and was, therefore, not conclusive, when the recanting codefendant claimed that the victim had only been shot once, but the medical examiner had testified at trial that the victim had in fact been shot twice); see also *People v. Wilson*, 2022 IL App (1st) 192048, ¶ 75 ("If taking

[that] affidavit testimony *as true* means anything at all, it must mean that a juror, hearing from [the new witness] at a hypothetical retrial, would *believe* his testimony." (alterations and emphases in original) (quoting *People v. Brooks*, 2021 IL App (4th) 200573, ¶ 44)).

¶ 39    Accordingly, at this stage we are not concerned with whether the new evidence is more convincing than the other evidence in the record. Rather, we are concerned only with the character of the new evidence and whether it is of such a nature that it "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48 (citing *Coleman*, 2013 IL 113307, ¶ 97). And in this case, Jackson's affidavit meets that standard. Indeed, when an affidavit "provides evidence that a different party is guilty, *** [it] is of such a conclusive character as to lead to a different result on retrial." *Robinson*, 2020 IL 123849, ¶ 76; see also *People v. White*, 2014 IL App (1st) 130007, ¶¶ 26–29 (finding that a new affidavit identifying someone else as the murderer was sufficient to establish conclusiveness at the pleading stage even when the affidavit conflicted with trial evidence of multiple witnesses identifying the defendant, and noting that an opposite conclusion would require the court to weigh evidence and make credibility determinations, tasks that are reserved for the third stage); *People v. Harper*, 2013 IL App (1st) 102181, ¶ 49 ("[W]here newly discovered evidence is both exonerating and contradicts the State's evidence at trial, it is capable of producing a different outcome at trial.").

¶ 40    While it is true that the State at trial produced what was essentially a signed confession from the defendant, the defendant has contested the voluntariness and reliability of that statement and has alleged that it was coerced, and his argument on that point cannot be dismissed out of hand, as it is true that there are some inconsistencies between the contents of his statement and the other trial evidence. Furthermore, and more importantly, at this second stage of proceedings, we

cannot use the defendant's statement to negate the conclusiveness of Jackson's affidavit unless it somehow acts as a positive and objective rebuttal of the affidavit, which it does not. Confessions are generally given great weight because people usually only confess to crimes that they actually committed, but it is not our job at this second stage to give it that weight. Rather, the relative weighing of the evidence is reserved for the third stage. At this second stage, we are concerned only with the character of Jackson's affidavit, and, because it points the finger at Taylor rather than the defendant, the defendant has made a substantial showing that it is of a conclusive character.

¶ 41    In sum, because Jackson's affidavit identifies someone other than the defendant as the person who shot the victim in this case, and because that allegation is not positively rebutted by the record, the affidavit is of a conclusive character. The defendant's petition should, therefore, be advanced to the third stage, where the credibility and weight of Jackson's allegations may be properly analyzed. Accordingly, we reverse the circuit court's dismissal of the defendant's petition and remand for the court to conduct third-stage proceedings.

¶ 42    Reversed and remanded with instructions.